Melody S. SWENSON, Plaintiff–
Appellee,

v.

John E. POTTER, Postmaster General
of the United States of America,*
Defendant–Appellant.

No. 98–16799.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 16, 2000.

Nov. 30, 2001.

---

* John E. Potter is substituted for his predecessor, William J. Henderson. *See* Fed. R.App. P. 43(c)(2).

Donald E.J. Kilmer, Jr., San Jose, California, argued the cause for Appellee.

Irene M. Solet, United States Department of Justice, Washington, DC, argued the cause for Appellant.

Before: KOZINSKI, FERNANDEZ and W. FLETCHER, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

When an employee accuses a fellow employee of sexual harassment, the employer must reconcile competing rights: the accuser's right to a harassment-free work-

place and the accused's right not to be disciplined without fair procedures and sufficient proof of wrongdoing. The employer, too, has a legitimate interest in resolving the dispute with the least possible disruption to its operations and without risking liability if a jury later disagrees with its conclusions. We consider the employer's options and responsibilities in such circumstances.

## I

While the facts were disputed at trial, we state them here consistent with the jury's verdict. Melody Swenson was working as a mail sorter for the U.S. Postal Service when she met Philip Feiner in August 1993. Feiner worked in the same general area of the San Francisco Processing and Distribution Center. Swenson testified that Feiner told her she was beautiful and sexy, that he dreamed about her at night, and that he watched her "ass moving." When Swenson clocked in to work, Feiner would be at the time clock waiting to greet her. According to Swenson, who is deaf, he asked her to teach him the sign for "sex" and told her, "I want to kiss you and go to a private room"; Swenson replied, "No, I'm married."

These incidents and comments made Swenson uncomfortable enough to complain to co-workers about Feiner's conduct. Nevertheless, she did not tell Feiner that his attention was unwelcome, nor did she inform her supervisors that Feiner was bothering her. Matters came to a boil on January 24, 1994, the day of the "grabbing incident." On that day, Feiner approached Swenson and said, "I want to kiss you," "You're my favorite," and grabbed her gloved hand. She jerked her hand away and screamed "Stop it," and he walked off. Swenson said she perceived Feiner's conduct to be the beginning of a rape.

Swenson complained to a co-worker, Li Lee. Lee told Swenson's supervisor, Ruben Domingo, that Feiner had grabbed Swenson's hand and tried to kiss it, but she did not tell Domingo that Swenson had complained of Feiner's conduct in the past. Domingo, who had never before received a complaint about Feiner, immediately discussed the grabbing incident with him. Domingo told Feiner he had committed sexual harassment and warned him to stay away from Swenson. Feiner disputed Swenson's characterization of the incident, but agreed to stay away. Feiner did in fact approach Swenson one last time to apologize. After insisting that she shake his hand, he walked away.[1]

Three days later, Swenson herself reported the grabbing incident to the human resources coordinator, Randy Rollman. Rollman passed the complaint on to his own supervisor, Barbara Faciane, who immediately opened an investigation. Faciane began by cautioning Feiner to stay away from Swenson and reiterating that sexual harassment is unacceptable. Faciane then interviewed Swenson, Lee and Domingo, and asked them all for written statements. Swenson provided one, then revised it a week later with the assistance of an interpreter provided by the Postal Service.[2] In her statement, Swenson disclosed—for the first time to a supervisor—the comments Feiner had made over the preceding months, and she repeated her

---

1. Swenson testified that Feiner said: "I'm sorry. I won't bother you again." He also asked her why she had told everyone about him, saying that "[i]t made [him] embarrassed."

2. The agency attempted to obtain an interpreter sooner, but was unable to find an earlier time when both Swenson and an interpreter were available. It provided Swenson with the services of a sign language interpreter as soon as she and the interpreter found a mutually convenient time to meet.

account of the grabbing incident. Feiner, for his part, claimed he had merely tried to shake Swenson's hand and, because Swenson had been wearing a dirty glove, had "held her wrist very lightly" to remove it. Feiner also denied making any sexual comments to Swenson on other occasions.

On the same day as her initial discussion with Swenson, Faciane temporarily moved her to a new location in the Processing Center in order to minimize contact between the two employees during the investigation. Faciane asked Swenson what she wanted done to resolve the complaint, and Swenson requested a meeting with Feiner, so that she could personally tell him to leave her alone. But the meeting never took place. The Postal Service had scheduled it for February 10, and had arranged for Swenson to meet with an interpreter, a management representative, a union representative and Feiner. However, Swenson stopped working after February 4, the day after she gave her revised statement to Faciane. Swenson said the grabbing incident gave her nightmares, and she was afraid to work in the same building as Feiner.

Jim Larson, manager of the entire Processing Center, met with Swenson and her union representative to try to resolve her complaint. Larson's effort proved unsuccessful and the Postal Service turned over responsibility for the investigation to Charles Bonds, a Senior Labor Relations Specialist. Over the next two months or so, Bonds interviewed Swenson three times. He investigated the grabbing incident and her other complaints by interviewing or obtaining written statements from her co-workers and supervisors. He also reviewed all transcripts and documents associated with the case. Bonds concluded his investigation in April or May 1994, finding insufficient evidence to support formal discipline against Feiner for sexual harassment.

In April, Bonds met with Swenson and her union representative to arrange for her return to work. Swenson agreed to return to work if assigned to the location where Faciane had moved her on January 28, away from Feiner's work area. Even though employees ordinarily must bid for new positions, the Postal Service reassigned her to that location and offered her a customized schedule to minimize contact with Feiner. Swenson returned to work on or about April 7, 1994, and remained in her new work area until she left for good on June 16, 1995. Her only contact with Feiner over that fourteen-month period consisted of some sixteen sightings in the Processing Center.

 The jury returned a special verdict finding that the Postal Service knew, or should have known, of Feiner's sexually harassing conduct as of January 24, 1994, the date Swenson's co-worker Li Lee reported the grabbing incident to Domingo, and that the Postal Service failed to take prompt and appropriate action to end the harassment once it became aware of it.[3] It awarded Swenson $125,000 in damages, but the district court reduced the award to $85,000. We review de novo the district court's denial of the Postal Service's motion for judgment as a matter of law, see *Marcy v. Delta Airlines*, 166 F.3d 1279, 1282 (9th Cir.1999), and the jury's verdict for substantial evidence, see *Ortiz v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 852 F.2d 383, 388 (9th Cir.1988).

## II

 The Postal Service argues that Swenson's claim is barred because she

---

**3.** The jury also found that Swenson was not constructively discharged from her employment. Swenson does not appeal this finding.

failed to exhaust administrative remedies. A discrimination complaint is timely only if the complainant has contacted an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). The Postal Service claims that Swenson's complaint was untimely because she did not speak to an EEO counselor until fifty-three days after the grabbing incident.

But the grabbing incident is not "the matter alleged to be discriminatory." Swenson claims that the Postal Service violated Title VII by failing to take appropriate corrective action in response to her allegation of co-worker harassment. The matter alleged to be discriminatory is the adequacy of the employer's response, not the co-worker's underlying behavior. *See* pp. 1191–92 *infra*. Swenson's statutory forty-five day period thus did not start to run until the employer took final action on her complaint. Because Swenson contacted an EEO counselor before the Postal Service had even concluded its investigation, she acted well before the forty-five day window had closed, and her discrimination complaint was timely.

### III

■ Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment is a form of sex discrimination. By tolerating sexual harassment against its employees, the employer is deemed to have adversely changed the terms of their employment in violation of Title VII. *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir.2000).[4]

■ To prove a "hostile work environment"[5] claim, plaintiff must demonstrate conduct "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (alteration and internal quotation marks omitted); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001). Where harassment by a co-worker is alleged, the employer can be held liable only where "its own negligence is a cause of the harassment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Title VII liability is direct, not derivative: An employer is responsible for its

4. While an employer may also violate Title VII by sanctioning harassment beforehand, *Brooks*, 229 F.3d at 924, Swenson does not allege that the Postal Service created a work atmosphere that encouraged or ignored employees' sexually harassing behavior.

5. We use the term "hostile work environment" only as a threshold indicator of the *type* of harassment alleged (i.e., as opposed to *quid pro quo* harassment). As the Supreme Court instructed in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), "[t]he terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.... The principal significance of the distinction is to instruct that Title VII is violated by either *explicit or constructive* alterations in the terms or conditions of employment and to explain [that the hostile work environment claim] must be severe or pervasive." *Id.* at 751–52, 118 S.Ct. 2257 (emphasis added). The label we attach to a particular claim, however, has no relevance to an employer's liability for an employee's discriminatory conduct. *See id.* at 752, 118 S.Ct. 2257; *see also* Eugene Scalia, *The Strange Career of Quid Pro Quo Sexual Harassment*, 21 Harv. J.L. & Pub. Pol'y 307, 322–23 (1998).

own actions or omissions, not for the co-worker's harassing conduct.

 If the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have "adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Faragher v. City of Boca Raton,* 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). On the other hand, an employer cannot be held liable for misconduct of which it is unaware. *See Brooks,* 229 F.3d at 924; *see also Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 811 (7th Cir.2000) ("Negligence of this nature exposes the employer not to liability for what occurred before the employer was put on notice of the harassment, but for the harm that the employer inflicted on the plaintiff as a result of its inappropriate response."). The employer's liability, if any, runs only from the time it "knew or should have known about the conduct and failed to stop it." *Ellerth,* 524 U.S. at 759, 118 S.Ct. 2257; *see also Brooks,* 229 F.3d at 924.

 The jury found that the Postal Service first had notice of Feiner's conduct on January 24, the date Domingo learned of the grabbing incident. Until then, Swenson had never complained to management about Feiner's behavior, and the Postal Service cannot be held liable for its actions (or inactions) prior to that date. *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir.1998).[6]

 Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is "reasonably calculated to end the harassment." *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864 (9th Cir.2001); *Fuller v. City of Oakland,* 47 F.3d 1522, 1528 (9th Cir.1995) (internal quotation marks omitted); *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir. 1991). This obligation actually has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation. *Fuller,* 47 F.3d at 1528; *Ellison,* 924 F.2d at 882.

 **A.** We first consider the Postal Service's immediate response to Swenson's complaint. Upon hearing Swenson's allegations, supervisors twice warned Feiner that his conduct was sexual harassment and ordered him to keep away from Swenson.[7] The Postal Service also separated the two employees pending the outcome of an investigation by moving Swenson to a different location within the same facility. Separating Swenson and Feiner did not eliminate all contact between them, but the Postal Service was not required to provide Swenson a Feiner-free workplace merely because she complained about him. The degree of separation imposed, if any, must be a function of the severity of the alleged harassment and the evidence provided to the employer in support of the complaint. The more egregious the conduct alleged, and the more

---

6. Plaintiff's counsel argued below that by taking inadequate remedial action, the employer ratifies (and becomes responsible for) past misconduct. We reject this contention. *Ellerth* makes it quite clear that the employer is responsible only for acts of misconduct committed after it has been put on notice. *Ellerth,* 524 U.S. at 759, 118 S.Ct. 2257; *see* *also Brooks,* 229 F.3d at 924; *Hostetler,* 218 F.3d at 811; *Adler,* 144 F.3d at 673.

7. At Swenson's request, the Postal Service also arranged a meeting between her and Feiner so she could tell him personally that she wanted to be left alone.

substantial the proof supporting the allegation, the harder the employer must try to minimize further contact between the two employees pending the outcome of the investigation.[8]

 The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. An investigation is a key step in the employer's response, see *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir.1987) (employer obliged to investigate complaint and to present a reasonable basis for its subsequent action), and can itself be a powerful factor in deterring future harassment. By opening a sexual harassment investigation, the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace. An investigation is a warning, not by words but by action. We have held, however, that the "fact of investigation alone" is not enough, *Fuller*, 47 F.3d at

1529. An investigation that is rigged to reach a pre-determined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation. *See id.*

The Postal Service here commenced an investigation on January 27, just three days after management learned of the grabbing incident and on the same day Swenson herself complained. Faciane asked Swenson for a written statement the day after she complained to Rollman and, at Swenson's request, scheduled a face-to-face meeting with Feiner to try to resolve her complaint. Faciane also discussed Swenson's complaint with Feiner, as well as with Domingo and Swenson's co-worker Lee. When Charles Bonds took over the investigation, he continued to develop the record to assess Swenson's complaint. He obtained a written statement from Christopher Rom, another of Swenson's co-workers. He interviewed Feiner once and Swenson three times, each time with the assistance of a sign language interpreter.[9]

---

**8.** The employer is not required to separate the complainant and the accused employee pending the outcome of the investigation. Depending on the circumstances, which can include the employer's legitimate interest in avoiding disruption to its business, the employer may reasonably decide that the employees must continue working together while awaiting the outcome of the investigation. At the very least, however, the employer must try to eliminate contact between the two employees that is not strictly business-related. If it reasonably concludes that the two employees must continue to have regular business contact during the course of the investigation, the employer must take reasonable steps to expedite the investigation.

**9.** At the initial interview on March 9, Swenson was represented by her union president. She said she did not want to transfer to a different facility and agreed to a customized work schedule as an interim solution. But she failed to report back to work. At the second interview, on March 16, a union steward represented Swenson at her request. He

suggested that she "couldn't even come to the area where ... the ugly memory has happened," and asked if the Postal Service could make an "accommodation" by transferring her to a different facility altogether. *See* n. 10 *infra*.

The dissent argues that Bonds was remiss in interviewing only Swenson and Feiner, not their "co-workers to see if any corroborating evidence existed." Dissent at 1207; *see also id.* at 1207–08, 1211. But as the dissent acknowledges, Dissent at 1207, Bonds was in charge of the investigation when Rom was asked to give a written statement. Lee had also given a written statement to Faciane. Moreover, none of Swenson's co-workers had witnessed any of the alleged acts of harassment, nor did Swenson claim they had. *Cf. Hathaway v. Runyon*, 132 F.3d 1214, 1218–19, 1224 (8th Cir.1997) (holding that when an employee presented an eyewitness's written statement describing a co-worker slapping her buttocks, the employer was remiss in failing to ask for the statement or interview the witness).

Management officials up to and including the plant manager met with Swenson and her representatives throughout the investigation, both to determine what had happened and to try to find a way to make her comfortable in the workplace. Swenson was able to present her complaint, articulate her concerns and express her view of preferred outcomes.

Bonds concluded the investigation in April or May, after about three to four months. While this may be somewhat longer than expected, the delay is explained by the fact that Swenson was not at work for most of that time, and interviews with her had to be scheduled when a sign language interpreter was available. All things considered, the Postal Service's interim response to Swenson's complaint was prompt and entirely appropriate.

**B.** We turn now to the permanent steps the Postal Service took in response to Swenson's complaint. While the Postal Service concluded that it could not sustain a charge of sexual harassment against Feiner, it nonetheless took permanent steps to separate Feiner and Swenson in the workplace. Without having to participate in the normal competition for a job change, Swenson was given a permanent job assignment that kept her from daily contact with Feiner. The Postal Service also offered Swenson a customized work schedule, which would have kept her from overlapping with Feiner's schedule. She chose, however, to return to her regular hours. Management representatives also discussed with Swenson various possibilities for job assignments to other Postal Service locations, but none of these turned out to be feasible, either because no open-

ings were available or because Swenson refused to go there.[10]

 We have held that an employer does not satisfy its remedial obligation by transferring the victim to "a less desirable location." *Ellison,* 924 F.2d at 882 (employer gave the victim a Hobson's choice of either working with her harasser or transferring to a less desirable location). Such a transfer adversely affects the terms and conditions of the victim's employment, and may itself be the basis for employer liability. *See Hostetler,* 218 F.3d at 811. But not every transfer adversely affects the victim's employment. If it decides to separate the two employees in the workplace, the employer may properly consider the relative ease of moving them and their respective importance to its business operations. The employer has wide discretion in choosing how to minimize contact between the two employees, so long as the accuser is not moved to an objectively less desirable position.

 Whether the position to which the employee is moved is less desirable is determined by objective factors that include, but are not limited to, the terms of employment. Thus, moving the accuser to a position with the same pay and responsibilities, but with a longer commute or an inconvenient work schedule, would be an inappropriate response. *See id.;* EEOC Compl. Man. (CCH) § 615.4(a)(9)(iii) (2000) (an employer's action is appropriate where it "fully remedie[s] the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner (for example, by requiring the charging party to work less

---

**10.** The Postal Service discussed with Swenson possible transfers to facilities in the Sacramento and Oakland Districts, as well as to other postal centers in the San Francisco District. The Sacramento District, however, was in the process of downsizing its workforce, so a transfer there was not possible, and Swen-

son ultimately decided to remain in San Francisco. She expressed concerns about losing her seniority and its benefits, as well as a reluctance to increase her commute or to leave her friends at the San Francisco Processing Center.

desirable hours or in a less desirable location)"). There is no evidence that Swenson's new position was objectively less desirable than the one she occupied at the time she complained about Feiner. The decision to move her, therefore, cannot support the jury's finding that the Postal Service failed to take appropriate corrective action after learning of her complaint.

While Swenson expressed discomfort with working in the same 435,000 square foot facility as Feiner, she saw him only about once a month and then usually from a distance. Except for a clumsy attempt at an apology, *see* n. 1 *supra,* and a vigorous "good morning" the following day, their contacts involved no speech or physical contact.[11] Even if we assume there were sixteen such contacts over a fourteen-month period (and Swenson, in fact, complained to the employer of only a few of these incidents), and even if we allow for the fact that Swenson may have been particularly sensitive to contact with Feiner following his misconduct, none of their encounters, either alone or collectively, amount to sexual harassment.

*Fuller v. City of Oakland,* 47 F.3d 1522, is directly on point. In *Fuller,* we held that sexual harassment had stopped as a matter of law, even though Romero, the harasser, continued to be plaintiff's supervisor, and plaintiff presented evidence that Romero had engaged in a variety of actions that arguably constituted petty harassment, such as delaying approval of her work requests and singling her out for unfavorable treatment. *Fuller,* 47 F.3d at 1526, 1528. "Fuller reported feeling ostracized and afraid for her safety, because visible isolation on the beat endangers an officer's safety. Fuller developed a severe stress disorder and went on disability leave. One of Fuller's examining psychiatrists wrote a letter concluding that Fuller should not be returned to duty under Romero." *Id.* at 1526. We assumed that all these allegations were true, and held nevertheless that "[n]one of the incidents of contact appear to have been more than routine .... Even in light of what went before, a reasonable woman would not find the incidents Fuller details sufficiently severe and pervasive to alter her working environment." *Id.* at 1528.

Feiner was not Swenson's supervisor, and he had no business contact with her after the investigation began; although Swenson was uncomfortable with his presence, their contacts were far less extensive than Fuller's contacts with Romero. Moreover, Romero's misconduct was much more egregious than Feiner's to begin with. *See id.* at 1525–26.[12] The district court in our case correctly observed that Swenson's sixteen encounters with Feiner did not amount to a hostile work environment.[13] What this means is that the harassment stopped entirely as of the time Swenson and Feiner were separated, which was within three days of the time the jury found the employer was put on notice. Moreover, the harassment here,

---

**11.** At trial, Swenson described their occasional contacts:

> Well, if I was sitting on the ... aisleway, I'd see [Feiner] walk by. And while I was working, I'd see him looking at me as he walked by, so I would see him. And near the machine, ... if I was working there, I would see him talking with someone else and looking at me when I was in this area.

**12.** Feiner's misconduct was also less serious than that in *Star v. West,* 237 F.3d 1036 (9th Cir.2001), where the harasser "grabbed or put his arms around" Star, and touched either her breasts or her shoulders and hips. *Id.* at 1037.

**13.** "If the jury did find there was sexual harassment because he stared at her 13 times [sic] in a year and a half, I would find, as a matter of law, that that was not sexual harassment."

unlike that in *Fuller*, stopped as a result of the employer's intervention, not by the harasser's voluntary and independent decision. *See id.* at 1529.

 According to *Ellerth*, the employer cannot be held liable unless it reacts negligently to the harassment complaint. 524 U.S. at 759, 118 S.Ct. 2257. Conversely, the employer will insulate itself from Title VII liability if it acts reasonably. Obviously, the employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment. *See Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir.1997) ("[A] good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment . . . [and] a jury later concludes that in fact harassment occurred." (citations omitted)).

 After conducting an investigation, the Postal Service here concluded that it could not support a case of sexual harassment against Feiner. That, of course, is quite different from saying that the harassment didn't happen.[14] In deciding whether to punish Feiner, the Postal Service could properly take into account that Feiner was covered by a collective bargaining agreement, and so had the right to grieve any discipline imposed on him. Having concluded that it had insufficient evidence to sustain a charge of harassment, the Postal Service had an entirely legitimate reason for declining to discipline Feiner and resorting to other methods of remedying the situation.

 As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment. *See Harris*, 132 F.3d at 984 ("We are mindful of the difficulty employers face when dealing with claims of harassment, finding themselves between the rock of an inadequate response under Title VII and the hard place of potential tort liability for wrongful discharge of the alleged harasser."); *Stuck in the Middle: Employers Can Face Lawsuits from Accused as Well as Accusers*, 69 U.S.L.W. 2539 (Mar. 13, 2001). Employees are no better served by a wrongful determination that harassment occurred than by a wrongful determination that no harassment occurred. We should be wary of tempting employers to conduct investigations that are less than fully objective and fair. Title VII "in no way requires an

---

14. Swenson's counsel made much of the fact that the Postal Service believed Feiner rather than Swenson. But the employer's abstract beliefs are of no consequence in determining Title VII liability. What matters are the employer's actions in light of the available evidence. In his testimony, Bonds explains that his purpose in conducting the investigation was not to decide who was telling the truth as such, but to determine whether the agency had sufficient evidence to support disciplinary action against Feiner:

> Q. Did you believe Phil Feiner more than you believed Melody Swenson on [the] issue [of whether Feiner asked Swenson to sign the word "sex"]?
> A. It's not a matter of believe. It's a matter of you have no eyewitnesses. That's

what you had there. You had one against one.
. . . .
> Q. So you believed [Feiner's] denial more than you believed [Swenson's] recitation of events; is that correct?
> A. No. What it is in these types of investigations I have to look and see whether or not there's going to be just cause to take the action against the person, and there was not just cause.
. . . .
> Q. If you believed [Swenson], why did you need someone to back her up?
> A. Because of the agreement between the Postal Service and the organization. Okay? You can't discipline an employee without just cause. It's just that simple.

employer to dispense with fair procedures for those accused or to discharge every alleged harasser." *Harris,* 132 F.3d at 984.

■■■■ The dissent makes much of supposed defects in the Postal Service's investigation. While we believe that the investigation was competent,[15] it ultimately doesn't matter. In considering whether the employer's response was appropriate, we consider the overall picture. Even assuming that the investigation was less than perfect, the Postal Service nevertheless took prompt action to remedy the situation. The harassment stopped. The only possible consequence of a better investigation could have been to make out a stronger case for disciplining Feiner. But the

purpose of Title VII is remedial—avoiding and preventing discrimination—rather than punitive. *Gregory v. Litton Sys., Inc.,* 472 F.2d 631, 632 (9th Cir.1973). Failure to punish the accused harasser only matters if it casts doubt on the employer's commitment to maintaining a harassment-free workplace. Where an employee is not punished even though there is strong evidence that he is guilty of harassment, such failure can embolden him to continue the misconduct and encourage others to misbehave. But where the proof of harassment is weak and disputed, as it was in this case, the employer need not take formal disciplinary action simply to prove that it is serious about stopping sexual harassment in the workplace.[16]

---

**15.** Swenson has never alleged that the investigation here was an effort to whitewash Feiner, or that it was designed to reach a predetermined result. As the dissent concedes, Dissent at 25, all of the incidents of which Swenson complained involved only herself and Feiner—no other employee witnessed them, *cf. Fuller,* 47 F.3d at 1526, 1529, *Hathaway,* 132 F.3d at 1218; there was no physical proof, such as love notes or phone records, *cf. Ellison,* 924 F.2d at 874, *Fuller,* 47 F.3d at 1529; so far as the record reveals, Feiner had an unblemished disciplinary record. *Cf. Star v. West,* 237 F.3d 1036, 1038 n. 1 (9th Cir.2001) ("Defense counsel conceded, in his opening statement, that [the harasser's] disciplinary record was indefensible.").

By contrast, the investigation in *Fuller* was a cruel farce. The investigator "often accepted Romero's [the accused harasser's] version [of disputed incidents] without taking reasonable and easy steps to corroborate that version," 47 F.3d at 1529; "failed to interview ... a percipient witness favorable to plaintiff"; and "warned [Romero] of the claims against him so that he could prepare extensive documentation in his defense," *id.* Even after Romero admitted to some of the misconduct and to lying about it, the investigator "failed to corroborate Romero's ... explanation" of a different alleged incident of harassment. *Id.* at 1526, 1529. Similarly, in *Hathaway v. Runyon,* 132 F.3d 1214 (8th Cir.1997), the investigation was commenced only after repeated complaints, *id.* at 1218–19, and then

was closed without consulting Hathaway and without interviewing an employee who had observed an egregious instance of sexual misconduct, *id.* at 1219, 1224. Nothing of the sort happened here.

**16.** There seems to be some tension among our cases as to whether an employer must discipline the harasser if it determines that harassment has in fact taken place. *Ellison* is ambiguous on this point, 924 F.2d at 882, while two judges in *Intlekofer v. Turnage,* 973 F.2d 773 (9th Cir.1992), stated that adequate remedial action could be taken without disciplining the harasser, at least as a first response. *Id.* at 781–83 (Keep, J., concurring); *id.* at 786 (Wiggins, J., dissenting). *Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475 (9th Cir.1997), on the other hand, seems to suggest that remedial measures "must include some form of disciplinary action," *id.* at 1482; *see also id.* at 1483 ("an employer must take at least some form of disciplinary action against a harassing co-worker"); *id.* ("the employer's actions must both end the current harassment and discipline the offender"). *Star v. West* harmonizes these cases by explaining that, even when it finds that harassment has taken place, the employer may satisfy its remedial obligation by actions far short of formal discipline: "The discussion in the cited cases makes clear that counseling or admonishing the offender can constitute an adequate 'disciplinary' response." *Star v. West,* 237 F.3d 1036, 1039 (9th Cir.2001).

Where, as here, the employer takes prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation.

The dissent also argues that the Postal Service should have accepted the findings of the EEOC administrative judge that it had violated Title VII. *See, e.g.,* Dissent at 1210. But the administrative judge based her conclusion on a finding that the employer had been put on notice by Rom that Feiner was harassing Swenson in August or September of 1993,[17] and *rejected* the Postal Service's position that it did not learn of the harassment until January 24, 1994. The jury, of course, agreed with the Postal Service as to when it received notice. *See* p. 1192 *supra.* Had the jury agreed with Swenson and the administrative judge that the Postal Service had been on notice for five months before it even opened an investigation, we would surely reach a different conclusion. As we have made clear, our determination that the Postal Service took appropriate, prompt corrective action hinges on the jury's finding that the Postal Service was put on notice in late January 1994. Having found against Swenson on this crucial—and hotly

contested—point,[18] the jury's conclusion that the employer's response subsequent to that date was not prompt and adequate was left without support in the record.

**REVERSED.**

WILLIAM A. FLETCHER, Circuit Judge, dissenting.

Melody Swenson claims that the United States Postal Service violated Title VII by failing to respond appropriately to her complaint of sexual harassment by a coworker. After a three-day hearing, an Administrative Law Judge of the Equal Employment Opportunity Commission found that the Postal Service had, indeed, violated Title VII. After a five-day trial, a federal jury found the same thing. The majority disagrees with the jury and sets aside its verdict. I dissent.

The Supreme Court has recently reminded us of the applicable standard when a losing party moves to set aside a jury verdict:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.

According to this standard, the Postal Service here *did* in fact discipline Feiner by advising him that his conduct amounts to sexual harassment and twice admonishing him to stay away from Swenson. Plaintiff's—and the dissent's—argument that this was not discipline because the employer did not consider it such, *see* Dissent at 30, is contrary to what we said in *Star:* "An employer's refusal to apply the label 'discipline' to any of these actions is not determinative of their adequacy as a remedy. What is important is whether the employer's actions, however labeled, are adequate to remedy the situation." *Star,* 237 F.3d at 1039.

17. The administrative judge stated:

> However, Swenson's coworker Christopher Rom testified that he informed supervisor Ruben Domingo that Feiner was bothering Swenson only three or four weeks

after Swenson came into the unit in August of 1993. Rom testified that Domingo said, "Maybe I'll talk to him." Rom testified that there was no cessation in Feiner bothering Swenson. (Testimony of Rom.)

> Domingo denies having been told of Feiner harassing Swenson. (Testimony of Domingo). I found Rom to be a credible witness. His testimony was forthright and consistent.... I conclude that the agency was put on notice of Feiner's unacceptable behavior approximately three or four weeks after Swenson came into the unit.

The jury plainly did not accord Rom the same credence as did the administrative judge.

18. In her closing argument, plaintiff's counsel twice urged the jury to find, based on Rom's testimony, that the Postal Service was put on notice in August or September of 1993. Obviously, the jury was not persuaded.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citations omitted). The Court rebuked the Fifth Circuit for failing to apply that standard:

> In holding that the record contained insufficient evidence to sustain the jury's verdict, the Court of Appeals misapplied the standard of review dictated by Rule 50.[T]he court disregarded critical evidence favorable to petitioner [and] failed to draw all reasonable inferences in favor of petitioner.... In concluding that the [employer's evidence] so overwhelmed the evidence favoring petitioner that no rational trier of fact could have found that petitioner was fired because of his age, the Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's.

*Id.* at 152, 120 S.Ct. 2097.

The majority wilfully flouts *Reeves.* It claims that it states the facts "consistent with the jury's verdict." Majority at 1189. But its statement of the facts would be "consistent with the jury's verdict" only if the Postal Service had won the verdict. The majority draws reasonable inferences in favor of the Postal Service. It makes credibility determinations in favor of the Postal Service. It weighs the evidence and draws conclusions in favor of the Postal Service. But the Postal Service did not win a verdict. Melody Swenson did. The majority is therefore required to draw inferences, make credibility determinations,

weigh evidence and draw conclusions in *her* favor.

The majority and I do not disagree over the fine points of Rule 50. Nor do we disagree over one or two small pieces of evidence. Rather, the majority simply chooses to believe the Postal Service's story of what happened, even though the jury chose not to believe it. In the materials that follow, I tell the story as Swenson is entitled to have it told, and as *Reeves* requires that it be told.

## I. Sexual Harassment of Swenson

Melody Swenson has been deaf from birth. She can read lips and can speak in verbal English, but she communicates most comfortably in American Sign Language ("ASL"), which has a somewhat different vocabulary and syntax from English. She reads and writes English with great difficulty.

Swenson began working at the Postal Service in 1977 at the age of 18, as a janitor cleaning toilets. One year later, she had successfully obtained a promotion to a job as a clerk, sorting and casing mail. At the time of the events described in this appeal, Swenson was in her early thirties. Nothing in the record indicates that she ever complained about her working environment during the sixteen years between her hiring and the events giving rise to this suit.

Philip Feiner was one of Swenson's coworkers. Feiner had worked at the Postal Service for about 20 years at the time of the events at issue. His first wife, a Korean whom he met while he was in the military, was deaf. Because she and her children knew Korean sign language rather than American sign language, Feiner enrolled in a basic ASL class along with them upon their arrival in the United States. Feiner aspired to be an actor and described himself as a man of "very formal

manners." At the time of the events in this case, he was unmarried.

When Swenson began working at the San Francisco Processing Center in August 1993, Feiner's interest in her initially appeared benign. He inquired about her children and her marriage, and asked Swenson to teach him some ASL. Within a month, however, his attention became unwelcome. Swenson testified that by September, Feiner told her that he dreamed of her. He said, "I like you because you are beautiful—you have a beautiful body, and you're sexy." Somewhat confused, Swenson responded by saying "thank you" and leaving. On another occasion, Feiner clarified his meaning by making an hourglass motion with his hands as he mouthed the word "sexy." Later, Feiner asked her how to sign the word "sex," and when Swenson, embarrassed, showed him, he laughed and walked away, repeating it.

On one occasion, Swenson testified that she observed Feiner and one of her supervisors pointing at her and speaking. When she asked Feiner what they had been saying, he told her that he had been talking to the supervisor "because you're so beautiful, and you have a beautiful sexy body, and I was watching your ass moving." Shocked, Swenson excused herself and went back to work. What Feiner characterized to the jury as "gallant" behavior was not limited to crude and unsettling comments. Swenson testified that on at least one occasion, Feiner said, "I want to kiss you and go to a private room." She refused and told Feiner that she was married.

Swenson testified that she could not easily avoid Feiner because her job required her to pass through his work space, and that she never went near his space for any other reason. Feiner's job, however, allowed him to visit her, and he often did. Swenson testified at trial that Feiner could also watch her from his workplace, and did

so every day. His constant attention bothered her and made her feel sufficiently uncomfortable that she complained to her co-workers about his conduct.

In December 1993, Feiner approached Swenson as she attempted to "clock in" to work. He asked if he could give her a Christmas gift. She told him, "No, you don't have to," and "I don't want it." Feiner responded, "Oh yes. I want to because I like to, and I want to give it to you." Swenson left the area, but the next day, Feiner came to her work area and threw a package at her, which contained a pen. After this incident, Swenson caught Feiner watching her while the other employees were away, and when she did, he said to her, "You're beautiful. You have a beautiful body. You have a sexy body, and you're my favorite." He told her that she was wearing "his favorite blouse," and that it looked "really good" on her.

On January 24, 1994, Feiner approached Swenson without warning and said, "I remember three months ago about the kiss." He then said, "Wait, I'm not finished talking. Do you remember three months ago about the kiss? ... I want to kiss you." He told her he wanted to kiss her because she was his "favorite." Swenson refused and protested again that she was married. Feiner said, "Well, come here" grabbed her hand, and, when she tried to pull back, maintained his grip. Only when Swenson screamed (using her voice) "Stop it!" did he retreat. She testified at trial that she was upset, shocked and scared, and that she felt like she was about to be raped when Feiner grabbed her hand. When her co-workers returned after their break, she related the story to a female co-worker named Li Lee, who wanted to tell their supervisor, Ruben Domingo, about the problem. Swenson, still frightened, agreed.

Li Lee testified that she immediately told Domingo that Feiner had hurt Swenson's hand in an attempt to grab and kiss it. Domingo testified that he told Feiner that day not to go near Swenson. Another supervisor, Barbara Faciane, testified that she repeated this instruction four days later, on January 28. Domingo told Feiner that what he had done "could be" sexual harassment. Swenson testified that Domingo "never" spoke to her "at any time" about her allegations of sexual harassment by Feiner.

Two days later, on January 26, Feiner approached Swenson despite the direction from Domingo not to do so. The circumstances were similar to those of Feiner's other unwanted advances: none of Swenson's co-workers were nearby, she was focused on her work, and Feiner interrupted her. Swenson testified that Feiner asked her why she had told everyone about the incident and said that it had embarrassed him. He said, "I'm sorry, I won't bother you again." She stated at trial that he finished by saying, "Please, I need you to be my friend. I need your friendship. Can we shake?" Swenson testified, "I felt at a loss, and felt like he was really harping on me." Swenson testified that she shook Feiner's hand to make him leave, and that he promised to leave her alone thereafter.

Feiner did not live up to his promise. Swenson testified that the very next day, "he said, 'Good morning, Hi. Hi.' really adamantly. And I felt really uncomfortable, and I said, 'I have to leave, I have to get out of here,' and I left." Later that day, on January 27, Swenson attended a safety meeting run by a supervisor named Randy Rollman. Because a sign language interpreter was present, Swenson was able to tell Rollman about the events of January 24. Swenson testified that Rollman was "shocked" and said that he would "make some plans."

According to Feiner, virtually none of Swenson's story is true. Feiner admitted at trial that he had kissed Swenson's hand on several occasions, and that he had told her that he would "bet she looked lovely in a dress." But he denied making advances towards her, denied asking her to sign the word "sex," denied mentioning her "beautiful ass." and denied calling her "sexy." According to Feiner, Swenson said she would be happy to accept his Christmas gift.

Feiner's account of the grabbing incident on January 24 was that Swenson had called out to him and that she had said that she was happy to see him. He claimed that when he reached out his hand to shake hers, she put her gloved hand in his. Feiner testified that he took this opportunity to teach her "high class" manners: "I held her wrist very lightly and started tugging on the end of her glove, and I said, 'You shouldn't shake hands with somebody with a glove on.'" Feiner admitted that Swenson immediately reacted with horror. Feiner said that the next night another clerk alerted him to the fact that Swenson had been telling others of the incident, and that he then apologized to her. With some prompting, he also mentioned that he had been warned by Domingo to stay away from Swenson. He claimed that after the apology, he never attempted to speak a word to Swenson, and actively avoided crossing her path.

The jury clearly disbelieved Feiner, as it had every right to do. In the space of nine pages of transcript, Swenson's attorney repeatedly demonstrated Feiner's lack of credibility. First, on cross-examination, the attorney asked Feiner if he "had taken about a year of sign language at a local high school." Feiner replied that this was "not correct." However, in his declaration supporting summary judgment, which was then read to the jury, Feiner had stated,

"My children and I ... attended some classes together in American Sign Language at a local high school for about a year."

Second, Feiner testified that he generally refuses to shake hands with people wearing gloves until they take their gloves off. He stated that doing so was "not good manners." He testified that when Swenson neglected to take her own glove off on January 24, he gave her the "benefit of the doubt" because he "started to believe that she had never been taught at home high class manners." The attorney then asked Feiner pointedly whether he had also given Swenson the benefit of the doubt "because of her handicap." He responded with a single word: "No." But in a previous statement, which was then read to the jury, Feiner had said, "In this case because of her handicap I was giving her the benefit of the doubt and trying to teach her something at the same time." And even though the jury had already heard testimony from Feiner's supervisor that Feiner had admitted trying to kiss Swenson's hand on January 24, Feiner denied ever admitting anything of the sort.

Third, in prior sworn testimony, Feiner had said that because he thought deaf people felt insecure and isolated, he would say "Hello, how are you," and "You look nice" to Swenson "every night when I saw her." But once again, he changed his story at trial; when asked if he routinely greeted and complimented Swenson, he denied doing so. He claimed at trial that Swenson initiated nearly 90% of their conversations.

## II. Action by the Postal Service

The jury found that Philip Feiner sexually harassed Melody Swenson, and the majority appears to concede that its finding was supported by the evidence. *Cf. Star v. West,* 237 F.3d 1036 (9th Cir.2001). The ultimate legal question before us is not, however, whether there was sexual harassment. The question, rather, is whether the Postal Service acted appropriately once Swenson's allegations of harassment were brought to its attention.

Negligence is the standard of care imposed by Title VII on employers in cases of allegations of co-worker sexual harassment. "An employer is negligent with respect to sexual harassment if it knew *or should have known* about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII[.]" *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (emphasis added). "When harassment by co-workers is at issue, the employer's conduct is reviewed for negligence." *Nichols v. Azteca Restaurant Enterprises,* 256 F.3d 864, 875 (9th Cir.2001). " '[E]mployers are liable for failing to remedy or prevent a hostile work environment of which management-level employees knew, or *in the exercise of reasonable care should have known.*'" *Ellison v. Brady,* 924 F.2d 872, 881 (9th Cir.1991) (emphasis added) (internal citation omitted).

Under the negligence standard, an employer must take "prompt and appropriate remedial action." *Intlekofer v. Turnage,* 973 F.2d 773, 779 (9th Cir.1992); *see also Fuller v. City of Oakland,* 47 F.3d 1522, 1528 (9th Cir.1995) ("prompt, effective action"). The totality of an employer's actions, including its investigation of the alleged harassment, must be "prompt and appropriate." An employer may conduct an investigation and conclude, based on that investigation, that no sexual harassment occurred. But the investigation itself must have been "prompt and appropriate."

The majority concludes that there was insufficient evidence to support the jury's finding that the Postal Service failed to

take "prompt and appropriate remedial action" after Swenson brought to its attention the allegations of Feiner's sexual harassment. I strongly disagree. There was ample evidence to support a conclusion that the Postal Service's investigation was negligently conducted, that the Postal Service "knew or should have known" of Feiner's harassment, and that the totality of the Postal Service's response to Swenson's allegations was not "prompt and appropriate remedial action."

## A. Notice to the Postal Service

There were two different dates on which the jury was asked to find that the Postal Service was on notice of allegations of sexual harassment by Feiner. The first date was sometime in August or September 1993, shortly after Swenson began working near Feiner. Christopher Rom, a co-worker, testified that Swenson had complained to him of Feiner's behavior and had asked him to speak to Feiner. Rom had declined to speak to Feiner, but had spoken instead to their supervisor, Ruben Domingo. Rom testified as follows about that conversation:

Q: And do you remember what you said to Mr. Domingo?

A: I was thinking that he might not understand if she told him. So I offered to tell him that she didn't like Phil Feiner coming in and talking to her.

The second date was January 24, 1994, when (as recounted above) Li Lee spoke to Domingo about Feiner grabbing Swenson's hand and trying to kiss her.

The jury made a special finding that the Postal Service was on notice of the alleged sexual harassment as of the second date, January 24, 1994. The majority does not dispute that there is sufficient evidence in the record to support this finding. The question, then, is whether the Postal Service took "prompt and appropriate remedi-al action" after it was put on notice on January 24, 1994.

## B. Action by the Postal Service after January 24, 1994

After Li Lee told Swenson's story to Ruben Domingo on January 24, Domingo spoke to Feiner but said nothing to Swenson. After Swenson spoke directly to Randy Rollman three days later, on January 27, Rollman said he would "make some plans." Supervisor Barbara Faciane then convened a meeting the next day, on January 28. Without giving Swenson any warning, Domingo approached her and asked her to come with him. He took her to a room where three Postal Service supervisors were waiting.

At trial, Swenson described what happened:

I said, "What's going on?" and we walked and he showed me in. And I was kind of shocked, you know, to see— Randy said, "Hi, come on," and I said, "Where is the interpreter?" And I was very upset about that because I felt that under the American Disability Act they're supposed to get interpreters for those sorts of meetings. And he said, "We don't have time to deal with an interpreter. Just write it down." And one would talk, and the other would talk. And I wasn't able to talk to him, and Randy said, "Please write." He said, "What happened?" and I gestured and started to cry, "Please leave me alone. Tell Phil to leave me alone." And I was crying, and they tried to calm me down, and [I said,] "He's bothering me, leave me alone." And I was very nervous and I wrote, and then we went into a different door. And I noticed Li Lee was there and so I sat down with Li Lee and they closed the door. And that's when I wrote, and I would ask Li Lee to spell some of the words.

With Li Lee's help, Swenson prepared a signed and dated statement, written on eight Postal Service routing slips.

Because of Swenson's difficulty with standard English, her January 28 statement is ungrammatical and awkward and contains frequent misspellings. But the statement unambiguously recounts Feiner's behavior, as the following excerpts make clear:

I got a new bid on Aug 17 to South and North Main. Phil Feiner talk to me. He say Hi and my name is Phil and he lean sign lang and smile at me.... Last November he say "Melody, tell me how sign sex." I feeling very shock about it. I say, "What?" and he say, "Please give kiss me, please go private." ... He say, "Melody, I'm very happy to see you." every day and "I always watch on you." and "You are beautiful." ... Last Monday, he walk to see me then he say, "I remember that last three month ago." I say "What?" He say, "Wait I'm not finish", I say, "OK, what?" He say "Do you remember that about me kiss you?" ... And he try grab my right hand very hard (looking like rape). My hand off to him and I say "Stop it" He say, Hey "don't do that." I look at him to face He very angry and mad. My hand very hurt. Then I have to tell Judy Chow and Lee and Chris about it. They are very surprise and shock. Please help me tell Mr Rubben Dimmgo.... He talk to Phil about it. Then last Wednesday Phil say, "Excuse me, ... I'm sorry won't bother you no more." ... Today, in the moring he still looking at me again ... He say Hi and his hand wave. And still he walk and still looking at me all the time.

Li Lee gave a written statement to Faciane at the January 28 meeting. Faciane did not interview or obtain statements from co-workers Christopher Rom and Judy Chow, even though they were both named in Swenson's written statement. (As will be seen in a moment, both Rom and Chow could have corroborated Swenson's story in important ways.) Rom eventually provided a written statement to Postal Service "management" about two months later. Chow was never interviewed by the Postal Service, and she never provided a written statement.

Also on January 28, immediately after the meeting at which Swenson and Lee gave their statements, Rollman moved Swenson to another work area. He did so without notice and against her wishes. She testified:

Q: And do you know why you were moved?

A: I don't know. I was surprised. I didn't know why they were moving me.... I was very surprised by that when I was moved.

 * * * * * *

Q: Did you want to be moved?

A: No.

Q: Did any member of the management at the San Francisco Processing Center ask your opinion on whether or not you wanted to be moved?

A: No.

Q: Who told you that you were going to be moved?

A: Mr. Rollmann [sic]. He showed me. He took my hand, and he showed me. He said, "Down there," and that was without an interpreter or anything.

Barbara Faciane testified that the Postal Service had moved Swenson only after getting her permission, but the jury had every right to believe Swenson's testimony and to disbelieve Faciane's testimony.

On February 3, the Postal Service provided a sign language interpreter to Swenson for an hour. The interpreter helped Swenson edit her January 28 written

statement by fixing grammar, verb tense and spelling. (The statement is quoted above in its unedited form.) Swenson added only six lines to her January 28 statement on February 3, all of them concerning her fear that Feiner might have a gun. (There is no evidence that Feiner, in fact, had a gun, and no issue was made at trial of the possibility that he might have had one.) Except for the addition of the six lines, the January 28 statement was substantively unchanged. Swenson was unable to complete the editing and supplementing process in the hour during which the interpreter was made available to her. Despite her inability to finish, the Postal Service did not make the interpreter available for a longer period.

On February 4, the day after she provided her edited statement, Swenson went on leave. On February 3 or 4, Rollman had arranged for a meeting to take place the following week, at which Swenson could meet personally with Feiner. However, because Swenson did not come to work after February 4, that meeting never took place.

No further investigative activity took place until early March. Then, after a meeting of Swenson, her union representative, and the Postal Service's plant manager went badly, the Postal Service finally "opened up" an "official investigation." The supervisor who conducted this investigation, Charles Bonds, testified that the renewed activity began "because some meeting Jim [Larson, the plant manager,] had with Swenson didn't turn out too well .... Jim came to me right after that and asked me to open up an official investigation."

Swenson came back to work in April, after Bonds began his investigation. Before she returned to work, her union representative had requested that Feiner, rather than Swenson, be moved during the investigation. Swenson was the party complaining that she had been sexually harassed, but it was she who had been moved; Swenson had been moved, against her will, after giving a written statement backed up by her co-worker Li Lee; and it was now about two months later, the "official investigation" was just getting under way, and Swenson was still assigned to the new workplace. Bonds relayed the request to Larson. Bonds testified that Larson "dismissed [the request] offhand." Larson said that he "saw no need."

The majority states that "Swenson agreed to return to work if assigned to the location where Faciane had moved her on January 28, away from Feiner's work area." Majority at 1190. The statement that Swenson agreed to come back to work "if assigned to the [new] location" implies that she wanted to come back to work at that location. Indeed, the statement may be read to imply that she would come back to work *only if* she could work at the new location. The majority's statement is based on a very unlikely inference. Its only support is in the transcript of Bond's third interview with Swenson, which took place on April 4. Before the actual interview began, Bonds dictated the following:

Mr. Jansen [Swenson's attorney] requested that this interview be held today with the sole purpose of getting Melody back to work. There have been some discussions off the record as to how this was going to transpire, and the following is what has been agreed to. Melody will return to work at the PD and C, her regular tour .... While this matter is still under investigation, Melody will be reassigned to the 030 operation. This will enable management to make sure there is a separation of her and Mr. Feiner.

The background for Bonds' dictated statement is that Swenson, through her union representative, had just requested

that Feiner's workplace be moved to allow her to return her to work at her old location, and that Jim Larson, the plant manager, had dismissed that request "off-hand." Bonds does not describe the off-the-record negotiations that led up to the agreement he recites. But the most likely inference is that, far from insisting that she return to the new work location, Swenson continued to want to have Feiner's location moved so that she could return to her old location. Only if the Postal Service continued to refuse to move Feiner would she have reluctantly agreed to return to work at the new location.

Swenson had stayed away from work since February 4 because, as she stated at trial, she was "scared":

Q: Why did you stay off of work?

A: Because I was scared. I was scared. I was very nervous and afraid, and I tried to go back one morning, and I couldn't make it. I turned around, and I went back home. I was very scared, and I was shaking and I went back home.

After she returned to work, Swenson encountered Feiner on a number of occasions. She testified that on one of those occasions, Feiner "looked very mad.... He kind of gave me an angry facial expression and stared at me and gave me a dirty look, and I was taken aback by that. It made me very nervous and my heart started to pound." On other occasions, "he would walk past me repeatedly or he would walk past where I was working[.]" She testified that she felt "just so scared, and I tried to avoid him[.]... But when I would see him, I would feel scared, and sometimes I'd go to the bathroom and sit just to be alone for a bit and calm down."

Swenson had three interviews with Bond. She told him the same basic story of harassment she had already recounted in her January 28 statement, but with additional details. Along with recounting the

details of the past harassment, Swenson told Bonds that Feiner was continuing to behave in ways that made her nervous and scared. Despite the obvious relevance of Feiner's ongoing behavior to his investigation, Bonds never asked Feiner about it. Bonds testified at trial that he had asked Feiner, but Swenson's counsel forced him to retract his testimony. Bonds testified in the afternoon:

Q: ... Ms. Swenson makes the following statement [in her interview with you], "And then he, you know, here comes Phil again standing there just staring at me, and it made me real nervous. And, you know, I just stayed home since then because I'm real scared of him just standing around just watching me all the time."

Do you recall Ms. Swenson making that statement to you in the course of the investigative interview?

A: Yes.

Q: Did you speak with Mr. Feiner about that?

A: Yes, I did.

Q: And did you speak with Mr. Feiner about that in the course of your investigative interview with him?

A: I believe I did.

Bonds then was given the evening to reread the transcript of his interview with Feiner. He testified the next morning:

Q: Now, did you have an opportunity to review Mr. Feiner's interview ...?

A: Yes, I did.

Q: And did you find anywhere in there where you asked Mr. Feiner about staring at Melody Swenson?

A: About staring at Melody Swenson?

Q: Yes.

A: I did not—I don't recall seeing it in there.

During the course of his investigation, Bonds interviewed only two people, Swenson and Feiner. He never interviewed any of Swenson or Feiner's co-workers to see if any corroborating evidence existed. He did not interview Li Lee, who had initially complained to Domingo on Swenson's behalf and who had accompanied her to the January 28 meeting. He also did not interview Christopher Rom. Rom testified that he provided a written statement "to management" (not "to Bonds") in March, but Bonds never testified that he read this statement. Judy Chow was never interviewed by anyone, and was never asked to provide a written statement.

Indeed, Bonds did not even ask Swenson about the *existence* of possible additional witnesses. In evidence that was presented to the jury, the EEOC ALJ recounted that Bonds had testified that he had asked Swenson about possible additional witnesses, but that his testimony had turned out to be untrue:

> Although Bonds testified [in the EEOC hearing] that he believed that he had asked Swenson about additional witnesses at one of the three investigations, I have reviewed all three transcripts and could find no indication that he had asked her.

After completing his official investigation in April or May, Bonds consulted again with Larson. Together, they concluded that there had been no harassment and terminated the investigation.

\* \* \* \* \* \*

Bonds repeatedly told the jury that he found no harassment because he had found no evidence corroborating Swenson's story. He first testified that there was "not just cause" to take action against Feiner "because there was no way for her to back up what [she] was saying." He then testified that discipline of Feiner would not have been appropriate "because she didn't—there was no one to back her up,

okay, and then Feiner's explanation." Finally, he testified that he did not believe Swenson because "well, basically there was no backing up of her story."

If Bonds had interviewed Lee, Rom, and Chow, he would have found the corroborating evidence he said he needed but did not have. All three co-workers had been listed by Swenson, by name, in the statement she had provided on January 28. The jury heard or read about the testimony of all three.

First, Li Lee told the jury that Feiner had only begun entering their work area after Swenson began working there. Lee testified that Swenson complained "quite a few times" to her of Feiner's unwanted attention, and that she had spoken to supervisors on Swenson's behalf.

Second, Christopher Rom told the jury that Swenson had complained to him of Feiner's behavior well before January 24, and had asked him to speak to Feiner on her behalf. As indicated above, Rom testified that he told their supervisor, Ruben Domingo, about the problem with Feiner. Rom also testified that between August 1993 and January 1994, he and Swenson would take their breaks at odd hours in order to avoid Feiner.

Third, Judy Chow had testified at the EEOC hearing on Swenson's behalf. The ALJ wrote (and the jury had before it) the following:

> Coworker Judy Chow testified that Feiner would pursue Swenson and that it was clear from Swenson's body language that she did not want to talk to him. When approached by Feiner, Swenson would be restless, darting and would sometimes back up trying to get away. Chow also testified that Feiner had told her about two interludes with Korean women who did not speak English well. She testified that one of these women was a Postal employee

whom Feiner said he convinced to leave her husband to live with him. Chow testified that it was her perception that Feiner had a pattern of victimizing women who did not communicate in English well. Chow testified that Swenson was in tears after the incident wherein Feiner grabbed her hand.

I found Chow to be a credible witness who testified in a very honest and straightforward manner.

Chow's testimony would have been particularly valuable to Bonds' investigation. She testified before the EEOC that Feiner had a pattern of sexually harassing vulnerable women, and that Swenson was in tears after Feiner grabbed her hand and tried to kiss her. This was precisely the sort of corroborating evidence that Bonds said he needed. Chow's testimony makes clear that her evidence was there for the asking. The problem for the Postal Service (and for the majority) is that Bonds did not ask.

Neither Lee, Rom, nor Chow directly observed the alleged harassment by Feiner. According to Swenson's own testimony, they could not have, for Feiner's pattern of behavior was to approach her while she was alone. This is, of course, the most common behavior pattern of harassers. Lee, Rom, and Chow would have corroborated Swenson's story in a number of important respects; indeed, they would have provided just the sort of corroborative evidence that is commonly available in sexual harassment cases. Bonds gave no reason at trial why he did not interview these co-workers, and the Postal Service suggests no reason in its arguments to us.

If the jury could have found that a non-negligent investigation by Bonds would have discovered this evidence corroborating Swenson's story, the jury verdict in her favor is clearly sustainable. The majority is aware of this critical point, but chooses not to address it head-on. Instead, it merely states:

> [Bonds] investigated the grabbing incident and [Swenson's] other complaints by interviewing or obtaining written statements from her co-workers and supervisors. He also reviewed all transcripts and documents associated with the case.

Majority at 1190. The majority thus suggests, without stating it explicitly, that Bonds had evidence from all relevant witnesses, including Lee, Rom, and Chow.

There are only three pieces of testimony in the record from which the majority could conceivably infer that Bonds conducted an investigation that included interviews with or statements by Lee, Rom, and Chow. Because the majority does not quote or refer to this testimony, I quote it here. The testimony makes clear that the majority's inference is unlikely.

The first testimony is by Bonds. But the testimony makes clear that he interviewed only Swenson and Feiner:

Q: And did you interview anybody?

A: Yes.

Q: Please describe.

A: Well, my interview with Mrs. Swenson is one. Mr. Feiner is two.

In his forty pages of testimony, Bonds refers repeatedly to these two interviews. He nowhere mentions interviews with anyone else or written statements by anyone else. The majority states that Bonds "obtained a written statement from Christopher Rom." Majority at 1193. But Bonds never testified that he obtained or even read such a statement, and Rom never testified that he gave a statement to Bonds.

The second testimony is by Randy Rollman concerning the January 28 meeting organized by Barbara Faciane. (This was the meeting at which Swenson cried and

wrote her unedited statement on postal routing slips.) Rollman testified:

Q: What, if anything, did you [Rollman] do in connection with the investigation?

A: The following evening [January 28] . . . we asked all the individuals to come up one at a time where they sat down, and we interviewed them.

Q: Who do you recall having asked to come upstairs?

A: Aside from Melody [Swenson] and Phil Feiner, Ruben Domingo, who was Melody's immediate supervisor at the time, and Li Lee was one of Melody's coworkers.

Bonds was not at that meeting. Indeed, he did not open up his official investigation until over a month later.

The third testimony is by Bonds:

Q: What was the reason no disciplinary action was taken against Mr. Feiner, if you know?

. . .

A. Mr. Larson called me into his office and asked me if I had read transcripts and *any other documents* that may have been associated with the case. And I told him that I had, and he wanted to know whether or not if I had found any sexual harassment. I said, "Well, I didn't," and he said, "I didn't either."

(Emphasis added.) The majority appears to infer that Bonds' general reference to "any other documents" indicates that he read written statements prepared by Swenson's co-workers during the course of his investigation. It is very unlikely that this phrase refers to such statements.

As an initial matter, if Bonds had read statements by Lee, Rom, and Chow, he almost certainly would have mentioned them. In his forty pages of testimony, Bonds nowhere mentions a statement by any of them. Further, and more important, if Bonds had read such statements, he would have been unable to say truth-

fully that he knew of no evidence corroborating Swenson's story. There is some evidence that Bonds was a less-than-forthcoming witness (see his retractions, recounted above); but the majority does not suggest that Bonds testified untruthfully. (If the majority were to conclude that Bonds lied on the stand about the lack of corroborating evidence, this would, of course, create a different but equally severe problem for the Postal Service.) Finally, and perhaps most tellingly, Chow never prepared a written statement. There is thus no document containing her testimony that Bonds could have read.

In a further attempt to defend Bonds' investigation, the majority infers that the jury did not believe Rom's testimony at trial. Rom had testified before the EEOC that he had spoken to Domingo on Swenson's behalf in August or September of 1993. Based on that testimony (which was not presented to the jury), the ALJ found that the Postal Service had been put on notice of possible sexual harassment at that time. As discussed above, the jury found that Rom had not put the Postal Service on notice; rather, according to the jury, the Postal Service was put on notice only when Li Lee spoke to Domingo on January 24, 1994. The majority concludes from this that "[t]he jury plainly did not accord Rom the same credence as did the administrative law judge." Majority at 1198 n.17.

The majority's inference is very unlikely. A much more likely inference is that the jury believed Rom, but concluded that his statement to Domingo simply did not provide notice of sexual harassment. The jury did not know what Rom said in the EEOC hearing, and therefore could neither believe nor disbelieve that testimony. The only testimony before the jury was, as indicated above, that Rom had told Domingo that Swenson "didn't like Phil Feiner

coming in and talking to her." The jury reasonably concluded that this statement did not put the Postal Service on notice of sexual harassment. Indeed, given the nature of the statement, the jury could hardly have concluded otherwise.

\* \* \* \* \* \*

Swenson filed a formal complaint with the EEOC on June 1, 1994. Añ ALJ conducted three days of hearings in May 1995. The ALJ heard testimony from Feiner and Swenson, as well as from Lee, Rom, and Chow, the co-workers whom Bonds had failed to interview. The ALJ concluded that the testimony supported Swenson's view of the facts, and the ALJ's written findings were placed in evidence before the jury. The ALJ concluded not only that Feiner had harassed Swenson, but that the Postal Service's investigation had been inadequate. The Postal Service rejected the EEOC's findings two months later.

Feiner was never transferred, even temporarily, from his work place in the Postal Service. No entry was ever made in his employment file. The most significant actions taken against him were the discussion in which Domingo told Feiner that grabbing and kissing Swenson's hand "could be" sexual harassment, and the instructions from Domingo and Faciane that Feiner should stay away from Swenson (which Feiner disobeyed). Ruben Domingo conceded somewhat reluctantly at trial that his "discussion" with Feiner was not discipline. Charles Bonds also testified that he told Swenson that there had been "no discipline" of Feiner.

Randy Rollman testified that after the Postal Service's rejection of the EEOC findings, Swenson lodged further complaints that Feiner continued to act in ways that made her uncomfortable. Rollman told her, "It's going to happen on occasion. There's nothing we can do." Melody Swenson finally quit her job on June 16, 1995. She turned her back on eighteen years of employment with the Postal Service because, as she testified, she felt that its supervisors were not protecting her and that they did not care about her or her concerns.

### III. Review of the jury verdict

The question before the jury was whether the totality of the response by the Postal Service to Swenson's allegations of sexual harassment was "prompt and appropriate remedial action." *Intlekofer*, 973 F.2d at 779. The totality of the response includes, but is not limited to, the investigation conducted by the Postal Service. In its verdict, the jury concluded that the Postal Service was on notice of Swenson's allegations on January 24, 1994, when Li Lee told Ruben Domingo about Feiner's harassment. The jury further concluded that the Postal Service's response after that date was not "prompt and appropriate."

The question before us in reviewing that verdict is not whether we would have reached that verdict if we had been jurors. Rather, it is whether there is sufficient evidence in the record from which the jury could reasonably have reached its verdict. In deciding that question, we must conclude that the jury resolved all credibility disputes and weighed all the evidence in favor of Swenson, and we must draw all reasonable inferences from the evidence in favor of Swenson. *Reeves*, 530 U.S. at 151–52, 120 S.Ct. 2097. Under that standard, the jury's verdict is clearly sustainable.

Based on the evidence presented to it, the jury could reasonably have concluded the following: The Postal Service was put on notice of allegations of sexual harassment of Melody Swenson by Philip Feiner on January 24, 1994. Four days later, it convened a meeting at which Feiner and

Swenson were asked to give statements. At that meeting, Swenson was not provided an interpreter. She was confused by the jumble of talk and began to cry. She prepared a written statement, as best she could, with the help of her co-worker Li Lee. In her statement, she named three co-workers who could corroborate her story—Li Lee, Judy Chow and Christopher Rom. Li Lee also gave a corroborating written statement at that meeting.

Immediately after the meeting on January 28, Swenson was moved to a new work location. She was given no advance notice of, or explanation for, the move. She did not give permission to be moved, and did not want to be moved. On February 3, Swenson tried, with the help of a sign language interpreter, to edit and supplement her January 28 statement, but her efforts were cut short because the Postal Service only made the interpreter available for an hour. Swenson went on leave on February 4 and did not return to work until April because of her continuing fear of Feiner. Her union representative asked that Feiner's work location be moved so that Swenson could return to her original work location when she came back to work, but the Postal Service refused. Jim Larson, the plant manager dismissed the request "offhand."

An official investigation was conducted by Charles Bonds, a Postal Service management employee. Bonds interviewed Swenson and Feiner. He did not ask Swenson in his interviews with her if there were co-workers who could corroborate her story. (He initially testified before the EEOC ALJ that he had done so, but that was not true.) He also did not ask Swenson if Feiner was still behaving in ways that made her nervous and afraid. (He initially testified before the jury that he had done so, but that also was not true.) Based on his interviews with Swenson and Feiner, Bonds concluded that Feiner had

not sexually harassed Swenson. Bonds' stated reason for his conclusion was the lack of corroborating evidence turned up in his investigation.

Bonds neither interviewed nor read written statements of the three co-workers—Li Lee, Christopher Rom, and Judy Chow—whom Swenson had listed in her written statement prepared and presented to the Postal Service on January 28. Lee, Rom, and Chow testified before the jury, and their testimony provided precisely the sort of corroborating evidence that Bonds said he needed but had not found. Bonds could easily have interviewed or read statements of Lee, Rom, and Chow, but he negligently failed to do so.

If Bonds had conducted a competent investigation, he would have uncovered evidence that would have led him to conclude that Feiner sexually harassed Swenson. If he had so concluded, the Postal Service would then have been in a position to take appropriate remedial action. For example, such action might have included moving Feiner's workplace rather than Swenson's when Swenson and Lee gave their statements to Barbara Faciane on January 28; it might have included moving Feiner's workplace to allow Swenson to return to her original workplace when she came back to work in April; and it might have included some sort of formal discipline of Feiner. But because of Bonds' negligent investigation, no appropriate remedial action at all was taken.

Based on the foregoing, it is obvious that there was sufficient evidence from which the jury could reasonably have concluded that the totality of the Postal Service's response was not "prompt and appropriate remedial action."

## IV. Conclusion

The majority in this case has taken the law into its own hands. Based on its own

evaluation of the evidence, it reverses a jury verdict in favor of Melody Swenson. It reweighs the credibility of witnesses, it discounts evidence favorable to Swenson, and it draws inferences favorable to the Postal Service. This would be appropriate if the Postal Service had won the jury verdict, but it did not.

Swenson won the jury verdict. She is entitled to have *her* witnesses believed, to have *her* evidence fully credited, and to have to inferences drawn in *her* favor. This has been the law since time immemorial. It is enshrined in Rule 50, and the Supreme Court underlined it a year ago in *Reeves*. In reversing the jury verdict, the majority has "disregarded critical evidence favorable to" Swenson, has "failed to draw all reasonable inferences in favor" of Swenson, and has "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Reeves*, 530 U.S. at 152, 120 S.Ct. 2097. I dissent.