Filed 2/18/25  Bailey v. San Francisco District Attorney's Office CA1/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| TWANDA BAILEY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE et al.,<br><br>    Defendants and Respondents. | A153520<br><br><br>(San Francisco City & County Super. Ct. No. CGC-15-549675)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

**BY THE COURT:**

It is ordered that the opinion filed herein on January 22, 2025, be modified as follows:

1. On page 29, the paragraph beginning "Accordingly, there has been no revival of any FEHA," at the end of the second full sentence of that paragraph, ending "failed to prevent such discrimination," add as footnote 10, which will require renumbering of all subsequent footnotes:

[10] In a petition for rehearing, Bailey argues she is entitled to proceed with a failure to prevent race discrimination claim based not on her supervisor's conduct, but on her *coworker's* conduct, i.e., her coworker's

utterance of the discriminatory epithet.  Given the current state of the law, Bailey is incorrect—because a coworker (as opposed to an employer) is not liable under FEHA for discrimination (as opposed to harassment).  (See *Raines v. U.S. Healthworks Medical Group* (2023) 15 Cal.5th 268, 275–277; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1164–1165, 1173; *Reno v. Baird* (1998) 18 Cal.4th 640, 663; see also *Roby v. McKesson Corp.*, *supra*, 47 Cal.4th at pp. 705–708 [discussing FEHA's distinction between actionable discriminatory conduct by employers and actionable harassing conduct by coworkers].)  And as we have discussed, absent a viable underlying race discrimination claim, which Bailey does not have with respect to her coworker, there is no viable "failure to prevent" discrimination claim against her employer.

There is no change in the judgment.
The petition for rehearing is denied.


Dated: _____
                      Humes, P. J.

2

Filed 1/22/25  Bailey v. San Francisco District Attorney's Office CA1/1 (unmodified opinion)
Opinion on remand from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TWANDA BAILEY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE et al.,<br><br>        Defendants and Respondents. | A153520<br><br><br>(San Francisco City & County Super. Ct. No. CGC-15-549675) |

This case is before us on remand after our Supreme Court clarified issues pertaining to race harassment and retaliation claims actionable under the California Fair Employment and Housing Act (FEHA).[1]  The high court's principal ruling was that a coworker's one-time use of a racial epithet can create a "hostile work environment" and whether it does so, requires an examination of "the totality of the circumstances" viewed from the " 'perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.' " (*Bailey v. San Francisco District Attorney's Office* (2024) 16 Cal.5th 611, 629–630, 634 (*Bailey*).)  The court further ruled there are triable issues as to (1) whether plaintiff Twanda Bailey's coworker's "one-time use of the N-word was, under the totality of the circumstances,

---

[1] Government Code section 12900, et seq.  All further statutory references are to the Government Code, unless otherwise indicated.

1

sufficiently severe so as to create a hostile work environment" supporting a harassment claim (*id.* at p. 634) and (2) whether Bailey "suffered an adverse employment action" at the hands of the City and County of San Francisco supporting a retaliation claim.[2] (*Id.* at pp. 634, 641.)

The Supreme Court also directed that we reconsider two issues. The first is whether there is a triable issue as to the City's liability for harassment if Bailey's coworker's racial slur is found to have created a hostile work environment. The City's liability turns on whether it took "immediate and appropriate corrective action" upon learning of the coworker's use of the N-word. (*Id.* at pp. 635–636.) We conclude there is a triable issue as to whether the City took such action, and therefore there is a triable issue as to whether the City is liable for harassment should the trier of fact find the coworker's racial epithet created a hostile work environment.

The second issue is whether, given the Supreme Court's rulings, Bailey's claims against the City for "discrimination" and for "failure to prevent discrimination" have been revived. (*Bailey, supra*, 16 Cal.5th at p. 642, fn. 10.) We conclude the answer is, in part, yes.

## DISCUSSION[3]

### *Immediate and Appropriate Corrective Action*

As the Supreme Court explained in *Bailey*, " 'When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions.' (*Roby* [*v. McKesson Corp.* (2009)] 47 Cal.4th [686,] 707 [(*Roby*)].) 'When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence. . . .' (*Ibid.*) Specifically, '[h]arassment of an employee . . . by an

---

[2] We collectively refer to defendants as the City.

[3] Because the parties are fully conversant with the factual and procedural background, we do not repeat it here.

employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action.' (§ 12940, subd. (j)(1).)" (*Bailey, supra,* 16 Cal.5th at p. 635.)

Observing it had "not previously had occasion to evaluate whether an employer's response to harassment constitutes 'immediate and appropriate corrective action[]' (§ 12940, subd. (j)(1))," the high court stated that "[i]n the analogous context of [title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII)] claims, the federal courts ask whether an employer has taken ' "adequate remedial measures" ' that are ' " 'reasonably calculated to end the harassment.' " ' " (*Bailey, supra,* 16 Cal.5th at p. 635, quoting *Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 875 (*Nichols*).) More specifically, "[t]he reasonableness of the remedy depends on its ability to stop the current harassment and deter future harassment." (*Bailey,* at p. 635.) "Our state appellate courts have applied this same standard in assessing claims arising under FEHA." (*Ibid.*)

Federal cases, however, differ somewhat in their application of the Title VII adequate-remedial-measures reasonably-calculated-to-end-the-harassment standard.

The City relies on cases taking the view that if the alleged harassment stops after the employer takes some action, the employer is not liable. (E.g., *Adler v. Wal-Mart Stores, Inc.* (10th Cir. 1998) 144 F.3d 664, 676 ["A stoppage of harassment shows effectiveness, which in turn evidences . . . reasonable calculation."]; see *E.E.O.C. v. Xerxes Corp.* (4th Cir. 2011) 639 F.3d 658, 670 [" 'A remedial action that effectively stops the harassment will be deemed

3

adequate as a matter of law.' "]; see also *Andreoli v. Gates* (3d Cir. 2007) 482 F.3d 641, 644, fn. 2 [same].)[4]

*Hostetler v. Quality Dining, Inc.* (7th Cir. 2000) 218 F.3d 798 (*Hostetler*), explains the rationale underlying this view. In that case, the plaintiff, a supervisor at a fast-food restaurant, claimed she was sexually harassed and assaulted by a coworker. (*Id.* at p. 802.) She eventually reported the conduct to her superiors and met with them. (*Id.* at pp. 802– 803.) What was said during the meeting was sharply disputed. The plaintiff claimed the district manager seemed to suggest she was the problem, rather than the coworker, who denied the plaintiff's claims. (*Ibid.*) The supervisors claimed they had assured the plaintiff sexual harassment was not tolerated and that an investigation would be commenced immediately. (*Id.* at p. 803, fns. 2 & 3.) According to them, an investigation was commenced, and supervisors promptly spoke with the coworker, apprising him of the company's policy on sexual harassment, telling him if the alleged conduct had occurred it constituted sexual harassment, and warning him if it happened again, it would result in disciplinary action. (*Id.* at p. 803, fn. 3.) Before the investigation was completed, the coworker quit. (*Ibid.*) The plaintiff was thereafter transferred to another location, resulting in her working evening and night hours and having a longer commute. (*Id.* at p. 804.) She claimed it was in retaliation for her complaint. (*Ibid.*) The defendants asserted otherwise. (*Ibid.*) The district court granted summary judgment to the defendants on the ground the alleged harassment did not rise to the level of creating a hostile work environment (*id.* at p. 805) and the employer, in any case, took prompt and reasonable corrective action. (*Id.* at p. 806.) The

_____

[4] While the City did not cite the latter two cases, they are also illustrative of the view the City takes.

4

circuit court reversed, ruling there were triable issues as to whether the coworker's alleged conduct created a hostile work environment (*id.* at pp. 807–809) and, given the plaintiff's transfer, whether the employer had taken appropriate corrective action. (*Id.* at p. 810.)

The circuit court went on to explain that the employer was not liable for the coworker's harassing conduct, itself, but rather for harms caused by its own actions. (*Hostetler, supra,* 218 F.3d at pp. 811–812.) In discussing the "negligence" predicate that underpins the Title VII adequate-remedial-measures reasonably-calculated-to-end-the-harassment standard (and also underpins the FEHA standard (*Bailey, supra,* 16 Cal.5th at p. 635)), the circuit court stated: "Negligence of this nature exposes the employer not to liability for what occurred before the employer was put on notice of the harassment, but for the harm [it] inflicted . . . as a result of its inappropriate response. Recall that in the usual case of co-worker harassment, the employer becomes liable to the employee only when it knows or should know . . . wrongdoing is afoot and yet fails to take steps reasonably designed to stop it. [Citation.] In that scenario, the employer . . . typically is held to account only for injuries that occur *after* . . . it is on notice of the harassment—in other words, injuries that the employer *could have prevented but did not*. Where, however, the employer takes action that puts a stop to the harassment, but in a way that inappropriately forces the plaintiff to bear the costs, it is the plaintiff's loss in pay, her demotion, or the other 'disamenities of work' for which she is entitled to compensation." (*Hostetler,* at p. 811, italics added.) In other words, under common law negligence principles, an employer is liable only for harms to which its conduct causally contributed.

Bailey relies on cases taking a more nuanced approach, including cases decided by the Ninth Circuit. (E.g., *Fuller v. City of Oakland* (9th Cir. 1995)

47 F.3d 1522, 1528–1529 (*Fuller*); *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 881–883 (*Ellison*).)

Since our Supreme Court in *Bailey* cited favorably to a Ninth Circuit case, specifically *Nichols, supra,* 256 F.3d at page 875, and also to a state court case citing Ninth Circuit authority*, Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1630 (*Bradley*) (citing *Swenson v. Potter* (9th Cir. 2001) 271 F.3d 1184 (*Swenson*) and *Ellison, supra,* 924 F.2d at p. 872), we consider this a signal to direct our attention to Ninth Circuit authority in reconsidering the issue posed to us on remand.  (*Bailey, supra,* 16 Cal.5th at p. 635.)

We therefore turn our attention to Ninth Circuit cases discussing the analogous adequate-remedial-measures reasonably-calculated-to-end-the-harassment Title VII standard.

The Ninth Circuit first addressed "what remedial actions taken by employers can shield them from liability" for harassment perpetrated by a coworker in *Ellison, supra,* 924 F.2d at page 881.  In that case, the plaintiff, an IRS employee, was subject to unwelcome romantic overtures, both verbal and written, by a coworker.  She eventually complained to her supervisor.  (*Id.* at pp. 873–874.)  The supervisor told the coworker to have no contact with the plaintiff, contacted her own supervisor, and then reported the situation to the personnel department.  (*Id.* at p. 874.)  Over the next several weeks, the supervisor reminded the coworker numerous times he was not to have any contact with the plaintiff.  (*Ibid.*)  The coworker, in turn, filed a grievance, which his union settled on terms favorable to him.  (*Ibid.*)  The plaintiff became " 'frantic,' " filed a formal sexual harassment complaint, and asked for a transfer.  (*Ibid.*)  The IRS investigator agreed the coworker's conduct constituted sexual harassment, but the Department of Treasury

6

concluded there was not "a pattern or practice of" sexual harassment under Equal Employment Opportunity Commission (EEOC) regulations and the IRS had taken adequate action to address the situation. (*Id.* at p. 875.)

The circuit court reversed summary judgment for the government, agreeing with several other circuits that an employer's action must be " 'reasonably calculated to end the harassment.' " (*Ellison, supra*, 924 F.2d at pp. 873, 882.) It should "persuade individual harassers to discontinue unlawful conduct." (*Ellison,* at p. 882.) But not all harassment, said the court, "warrants dismissal"; rather, action should be " 'assessed proportionately to the seriousness of the offense.' " (*Ibid.,* quoting *Dornhecker v. Malibu Grand Prix Corp.* (5th Cir.1987) 828 F.2d 307, 309.) "Employers should impose sufficient penalties to assure a workplace free from sexual harassment. In essence, . . . the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct. Indeed, meting out punishments that do not take into account the need to maintain a harassment-free working environment may subject the employer to suit by the EEOC." (*Ellison,* at p. 882, fn. omitted.)

The court went on to conclude there was a triable issue as to the adequacy of the IRS's remedial efforts. The record suggested the IRS "did not express strong disapproval of [the coworker's] conduct, did not reprimand [him], did not put him on probation, and did not inform him that repeated harassment would result in suspension or termination" but apparently "only told him to stop harassing" the plaintiff. (*Ellison, supra*, 924 F.2d at p. 882.) "Title VII requires more than a mere request to refrain from discriminatory

7

conduct.  [Citation.]  Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment." (*Ibid.*)  Thus, if the plaintiff proved on remand that the coworker "knew or should have known that his conduct was unlawful and that the government failed to take even the mildest form of disciplinary action," not only would the government's initial remedy be deemed insufficient, but there would also be a triable issue as to whether the government "properly disciplined" the coworker.  (*Id.* at pp. 882–883.)

In *Fuller,* the circuit court elaborated on the *Ellison* standard.  In *Fuller*, the plaintiff was subject to months of nightmarish romantic pursuit and harassment by a fellow police officer, but did not report the behavior. (*Fuller, supra,* 47 F.3d at pp. 1525–1526.)  When the coworker was transferred to a position of authority over the plaintiff, other officers learned of the harassment and brought it to the attention of the chief, and an investigation ensued.  (*Id.* at p. 1526.)  Apparently, the coworker was warned about the investigation (although the plaintiff was told otherwise) and from that point on, he did not engage in any conduct akin to the earlier harassment.  (*Id.* at pp. 1526, 1529.)  While purporting to conduct a thorough investigation, the person tasked with the job did not interview the harassing officer or numerous other witnesses and eventually recommended closing the investigation for lack of evidence, having credited all evidence favorable to the harassing officer.  (*Ibid.*)  The recommendation was rejected, but still it was months before the harassing officer was interviewed.  (*Ibid.*)  The final report ultimately recommended a finding of unfounded.  (*Id.* at p. 1526.)  The plaintiff developed a severe stress disorder and took disability leave.  On being cleared to return to work, she was told she would again be assigned to a post subordinate to that of the co-officer.  At that point, she resigned.  (*Ibid.*)

8

The district court conducted a bench trial (erroneously, the circuit court ruled) and found against the plaintiff. As to her Title VII harassment claim, the circuit court concluded that while the coworker's early behavior created a hostile work environment, his later conduct after the investigation commenced did not. (*Fuller, supra*, 47 F.3d. at pp. 1525, 1528.) The city therefore urged it had taken appropriate remedial action and was not liable for the harassment. "As the City sees it, because the harassment stopped, its response was *ipso facto* reasonable." (*Id.* at p. 1528*.*)

But "this analysis," said the court, "omits a critical step. The fact that harassment stops is only a test for measuring the *efficacy* of a remedy, not a way of excusing the *obligation* to remedy. Once an employer knows or should know of harassment, a remedial obligation kicks in. [Citations.] That obligation will not be discharged until action—prompt, effective action—has been taken. Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others. [(*Ellison, supra*, 924 F.2d at p. 882.)] If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach. Our prior cases stand for the proposition that an employer's actions will not necessarily shield it from liability if harassment continues. [Citation.] It does not follow that the employer's failure to act will be acceptable if harassment stops." (*Fuller, supra*, 47 F.3d at pp. 1528–1529.) "Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to a ratification of the prior harassment. We refuse to make liability for ratification of past harassment turn on the fortuity of whether the harasser, as he did here, voluntarily elects to cease his activities. . . ." (*Id.* at p. 1529.)

9

*Fuller*'s analysis is, thus, not wholly congruent with common law negligence theory, as it does not require causality between an employer's lack of, or insufficient, remedial action and the harassment perpetrated against the employee. Rather, it uncouples consideration of the employer's response from the traditional common law negligence elements of causality and damages. Thus, in our view, the *Ellison/Fuller* approach is better described as a means of imposing derivative liability for, or finding ratification of, the coworker's *initial* harassing conduct. The employer will also, of course, be liable for any *subsequent* harassing conduct that is due to, or is *causally related* to, the employer's failure to take immediate and appropriate corrective action.

In *Yamaguchi v. United States Department of the Air Force* (9th Cir. 1997) 109 F.3d 1475 (*Yamaguchi*), the circuit court employed the *Ellison/Fuller* approach in upholding the denial of cross-motions for summary judgment as to the employer's liability for alleged harassment. In that case, the plaintiff, a civilian Air Force employee, was subjected to appallingly inappropriate sexual attention by a master sergeant who was supposed to train and assist her. (*Id.* at p. 1478.) The attention escalated to after-hours threats and then to acts of physical harm, including rape. (*Ibid.*) The plaintiff eventually reported some of the conduct, but not the rape. (*Ibid.*) Supervisory personnel immediately instructed the sergeant to have no contact with the plaintiff and within two weeks moved him to a different facility. (*Id.* at p. 1479.) The sergeant was told several more times he was not to go near the plaintiff, and at his request, he was reassigned several months later to a different base. (*Ibid.*) In the meantime, the plaintiff developed mental and emotional problems. Eventually, the Air Force terminated her employment. (*Ibid.*)

10

After summarizing the *Ellison/Fuller* approach, the circuit court explained why there was a triable issue as to the government's liability for the sergeant's harassing conduct. "After [the plaintiff] complained of sexual harassment, [the sergeant] was ordered to have no further contact with her, his work site was changed, and his building key taken away. [He] was no longer permitted into [the plaintiff's] building without an escort. These actions were intended to stop the harassment and, to this end, were presumably adequate. However, the employer's actions must both end the current harassment and discipline the offender. [(*Ellison, supra*, 924 F.2d at p. 881.)] At no time was [the sergeant] officially disciplined or reprimanded for his actions nor was possible discipline ever discussed with him by his supervisors. No letter regarding the incidents was placed in his file and the incidents had no effect on his rank or placements." (*Yamaguchi, supra,* 109 F.3d at p. 1483.)

The government maintained that given " 'the unique structure of the military, the methods of discipline . . . vary from those commonly employed by the civilian workforce,' " and "in the military context, the actions taken against [the sergeant] should be considered disciplinary because they 'are steps which carry serious implications.' " (*Yamaguchi, supra*, 109 F.3d at p. 1483.) This did not, however, said the court, entitle the government to summary judgment. Rather, it gave rise to "a factual dispute" as to "whether the actions taken in response to [the plaintiff's] complaint were adequate remedial measures." (*Ibid.*)

Several years later, in 2001, the Ninth Circuit issued a trilogy of cases examining an employer's liability for harassment by a coworker.

The first was *Star v. West* (9th Cir. 2001) 237 F.3d 1036 (*Star*), in which the circuit court affirmed a judgment for the employer following a

11

court trial. (*Id.* at p. 1037.) In that case, the district court found the plaintiff had been grabbed or groped by a coworker on two occasions. (*Ibid.*) She told a supervisor, who promptly confronted the coworker, told him the allegations were serious, and directed him to stay away from the plaintiff. (*Ibid.*) The next day, the employer ordered an investigation. (*Ibid.*) The harassment ceased. (*Id.* at p. 1038.) As a " 'precautionary measure,' " the employer changed the coworker's shift to limit overlap with that of the plaintiff. (*Ibid.*) The circuit court upheld the district court's determination that the employer had taken appropriate action. (*Id.* at pp. 1038–1039.)

The court articulated the Title VII standard as follows: " 'Once an employer knows or should know of [coworker] harassment, a remedial obligation kicks in.' [(*Fuller, supra*, 47 F.3d at p. 1528.)] Such an employer will be liable for the hostile work environment created by the coworker unless 'the employer . . . takes adequate remedial measures in order to avoid liability.' [(*Yamaguchi, supra*, 109 F.3d at p. 1482.)] The employer's actions should be 'reasonably calculated to end the harassment.' [(*Ellison, supra*, 924 F.2d at p. 882.)]" (*Star, supra,* 237 F.3d at p. 1038.) Notably, the court did not quote *Ellison's* comment that a trier of fact "may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct." (*Ellison*, at p. 882.) Nor did it mention *Fuller*'s similar comment about "deterring future harassment—by the same offender or others." (*Fuller*, at p. 1528.)

The circuit court went on to discuss the parameters of the adequate-remedial-measures reasonably-calculated-to-end-the-harassment standard. Specifically, the court rejected the plaintiff's assertion—based on "language in several of our cases"—that "an adequate employer response must always involve some form of 'discipline.' " (*Star, supra,* 237 F.3d at p. 1038.) The

court explained that, in fact, its prior cases indicated "counseling or admonishing the offender can constitute an adequate 'disciplinary' response" as a " 'first resort' " and do so regardless of whether the employer denominates such action as " 'disciplinary.' " (*Id.* at p. 1039.)

The second case was *Nichols, supra*, 256 F.3d 864. In that case, several coworkers openly harassed the plaintiff "[t]hroughout his tenure" at a restaurant because they perceived him as gay and effeminate. (*Id.* at pp. 869–870.) After on-site supervisors ignored his complaints for years, he reported the harassment to the restaurant chain's human resources director. (*Id.* at pp. 870–871.) The latter told him to report any new harassment to an on-site manager, while promising to make "spot checks" for two weeks to ensure the harassment ceased. (*Id.* at p. 871.) The plaintiff reported no further harassment. (*Ibid.*) Following a court trial, the district court found for the defendant on all claims. (*Id.* at p. 869.) The circuit court reversed in part, including as to coworker harassment and the employer's liability. (*Ibid.*)

The court articulated the Title VII standard as follows: "In this circuit, as in others, 'remedies [for sexual harassment] should be "reasonably calculated to end the harassment." ' [(*Ellison, supra*, 924 F.2d at p. 882.)] The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.' [(*Ellison,* at p. 882.)] When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment. [(*Fuller, supra*, 47 F.3d at pp. 1528–1529.)]" (*Nichols, supra,* 256 F.3d at pp. 875–876.)

13

Although the district court concluded the employer had satisfied the reasonably-calculated-to-end-harassment standard, the circuit court ruled its underlying factual finding was not supported by the evidentiary record. (*Nichols, supra*, 256 F.3d at p. 876.) "[The employer] did nothing after [the plaintiff] complained to his assistant and general managers. Although [the employer] took some action in response to [a later] complaint, its remedy fell short. [¶] Following [the plaintiff's] complaint, [the] human resources director told [him] to inform the . . . general manager if the offensive conduct recurred, and conducted a handful of spot checks in the two weeks after [the plaintiff] complained. This solution did not remedy the harassment that had already occurred, and was not adequate to deter future harassment. The company made no effort to investigate [the plaintiff's] complaint; it did not discuss his allegations with the perpetrators; it did not demand that the unwelcome conduct cease; and it did not threaten more serious discipline in the event the harassment continued. [Citation.] Moreover, by conditioning its response on [the plaintiff's] reports of further harassment, [the employer] placed virtually all of its remedial burden on the victimized employee. Although [the employer's] request for a report regarding further harassment may have been well-meaning, and gave some support to [the plaintiff], this response was not sufficient." (*Ibid.,* fns. omitted.)

The circuit court also addressed the employer's contention "it should be absolved of liability because [the plaintiff] failed to report any harassment after his [later] complaint." (*Nichols, supra*, 256 F.3d at p. 876, fn. 12.) "This argument," said the court, "is not a defense to liability in the face of an inadequate remedial response. It goes solely to the question of the extent of damages, which is a matter to be decided by the district court following remand." (*Ibid.*)

14

The third case of the trilogy was *Swenson, supra,* 271 F.3d 1184.  In that case, the plaintiff, a postal worker, experienced, among other things, inappropriate sexual comments by a coworker but did not complain to her supervisors.  (*Id.* at p. 1189.)  After a " 'grabbing incident,' " however, she told a coworker who told the plaintiff's supervisor.  (*Ibid.*)  The supervisor "immediately" spoke with the coworker, told him "he had committed sexual harassment," and "warned him to stay away" from the plaintiff.  (*Ibid.*)  The coworker disputed the plaintiff's characterization of the incident but agreed to stay away.  (*Ibid.*)  The plaintiff subsequently reported the incident to the company's human resources coordinator and an investigation was "immediately opened."  (*Ibid.*)  The coworker was again told to "stay away" from the plaintiff and that "sexual harassment is unacceptable," and the plaintiff was moved to a new work area "to minimize contact" with the coworker.  (*Id.* at pp. 1189–1190.)  The investigator spoke with the plaintiff and her union representative several times and obtained statements from coworkers and the plaintiff's supervisors.  Ultimately, the investigator concluded there was "insufficient evidence to support formal discipline."  (*Id.* at p. 1190.)  No further incidents occurred.  (*Ibid.*)  Nearly a year and a half after the reported grabbing incident, the plaintiff filed suit.  (*Ibid.*)  The case was tried by a jury which found for the plaintiff.  The government appealed the verdict and denial of its motion for judgment as a matter of law.  The circuit court majority reversed.  (*Id.* at pp. 1190, 1198.)

The majority described the matter before the court as follows: "When an employee accuses a fellow employee of sexual harassment, the employer must reconcile competing rights: the accuser's right to a harassment-free workplace and the accused's right not to be disciplined without fair procedures and sufficient proof of wrongdoing.  The employer, too, has a

15

legitimate interest in resolving the dispute with the least possible disruption to its operations and without risking liability if a jury later disagrees with its conclusions.  We consider the employer's options and responsibilities in such circumstances." (*Swenson, supra*, 271 F.3d at pp. 1188–1189.)

The majority commenced its analysis with the statement, "To prove a 'hostile work environment' claim, [the] plaintiff must demonstrate conduct 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' [(*Meritor Savings Bank, FSB v. Vinson* (1986) 477 U.S. 57, 67; see *Clark County School Dist. v. Breeden* (2001) 532 U.S. 268.)]  Where harassment by a co-worker is alleged, the employer can be held liable only where 'its own negligence is a cause of the harassment.' [(*Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742, 759 (*Ellerth*).)]  Title VII liability is direct, not derivative: An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." (*Swenson, supra,* 271 F.3d at pp. 1191–1192, fn. omitted.)

The majority continued, "If the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have 'adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.' [(*Faragher v. City of Boca Raton* (1998) 524 U.S. 775, 789.)]  On the other hand, an employer cannot be held liable for misconduct of which it is unaware.  [([Citation]; see also *Hostetler*, *supra,* 218 F.3d at p. 811 ['Negligence of this nature exposes the employer not to liability for what occurred before the employer was put on notice of the harassment, but for the harm that the employer inflicted on the plaintiff as a result of its inappropriate response.'].)]  The employer's liability, if any, runs only from

16

the time it 'knew or should have known about the conduct and failed to stop it.' [(*Ellerth, supra,* 524 U.S. at p. 759. . . .)]" (*Swenson, supra,* 271 F.3d at p. 1192.)

The majority went on to state that notice of allegedly harassing conduct triggers the "employer's duty to take prompt corrective action that is 'reasonably calculated to end the harassment.' " (*Swenson, supra,* 271 F.3d at p. 1192, quoting *Nichols, supra,* 256 F.3d at p. 864; see *Fuller, supra,* 47 F.3d at p. 1528; *Ellison, supra,* 924 F.2d at p. 882.) "This obligation," said the majority, "actually has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation. [(*Fuller,* at p. 1528; *Ellison,* at p. 882.)]" (*Swenson,* at p. 1192.)

The majority then proceeded to consider the Postal Service's "immediate response" to the plaintiff's complaint—twice warning the coworker his conduct constituted sexual harassment and ordering him to stay away from the plaintiff.[5] (*Swenson, supra,* 271 F.3d at p. 1192.) The Postal Service also separated the two employees pending the outcome of an investigation by moving the plaintiff to a different location within the same facility. This did not eliminate all workplace contact between the employees, but the Postal Service was not required to do so. "The degree of separation imposed, if any, must be a function of the severity of the alleged harassment and the evidence provided to the employer in support of the complaint. The more egregious the conduct alleged, and the more substantial the proof

---

[5] At the plaintiff's request, the Postal Service also arranged a meeting between her and the coworker so she could tell him personally that she wanted to be left alone. (*Swenson, supra,* 271 F.3d at p. 1192, fn. 7.)

17

supporting the allegation, the harder the employer must try to minimize further contact between the two employees pending the outcome of the investigation."[6] (*Swenson*, at pp. 1192–1193.)

"The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. An investigation is a key step in the employer's response [citation], and can itself be a powerful factor in deterring future harassment. By opening a sexual harassment investigation, the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace. An investigation is a warning, not by words but by action. We have held, however, that the 'fact of investigation alone' is not enough, [(*Fuller, supra*, 47 F.3d at p. 1529)]. An investigation that is rigged to reach a pre-determined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation. [(See *id*.)]" (*Swenson, supra,* 271 F.3d at p. 1193.)

The majority concluded the Postal Service's investigation, commenced three days after management learned of the grabbing incident and on the same day the plaintiff herself complained, and during which statements were

---

[6] "The employer is not required to separate the complainant and the accused employee pending the outcome of the investigation. Depending on the circumstances, which can include the employer's legitimate interest in avoiding disruption to its business, the employer may reasonably decide that the employees must continue working together while awaiting the outcome of the investigation. At the very least, however, the employer must try to eliminate contact between the two employees that is not strictly business-related. If it reasonably concludes that the two employees must continue to have regular business contact during the course of the investigation, the employer must take reasonable steps to expedite the investigation." (*Swenson, supra,* 271 F.3d at p. 1193, fn. 8.)

taken and interviews conducted, was a "prompt and entirely appropriate" "interim response" to the plaintiff's complaint. (*Swenson, supra*, 271 F.3d at pp. 1193–1194.)

It then considered "the permanent steps" the Postal Service took in response to the complaint. (*Swenson, supra*, 271 F.3d at p. 1194.) Although the Postal Service concluded "it could not sustain a charge of sexual harassment against [the coworker], it nonetheless took permanent steps to separate [him] and [the plaintiff] in the workplace. Without having to participate in the normal competition for a job change, [the plaintiff] was given a permanent job assignment that kept her from daily contact with [the coworker]. The Postal Service also offered [her] a customized work schedule, which would have kept her from overlapping with [the coworker's] schedule. She chose, however, to return to her regular hours. Management representatives also discussed with [her] various possibilities for job assignments to other Postal Service locations, but none of these turned out to be feasible." (*Ibid.*)

With respect to moving the plaintiff to a different position, the majority observed the court had "held that an employer does not satisfy its remedial obligation by transferring the victim to 'a less desirable location.' [Citation.] . . . But not every transfer adversely affects the victim's employment. If it decides to separate the two employees in the workplace, the employer may properly consider the relative ease of moving them and their respective importance to its business operations. The employer has wide discretion in choosing how to minimize contact between the two employees, so long as the accuser is not moved to an objectively less desirable position." (*Swenson, supra,* 271 F.3d at p. 1194.) There was "no evidence that [the plaintiff's] new position was objectively less desirable than the one she occupied at the time

19

she complained about [her coworker]. The decision to move her, therefore, [could not] support the jury's finding that the Postal Service failed to take appropriate corrective action after learning of her complaint." (*Id.* at p. 1195.)

Thereafter, none of the encounters between the plaintiff or her coworker, "either alone or collectively, amount[ed] to sexual harassment." In this regard, the majority found *Fuller, supra,* 47 F.3d 1522, "directly on point." (*Swenson, supra,* 271 F.3d at p. 1195.) In *Fuller,* as in the case before the court, no further conduct on the part of the coworker was " 'sufficiently severe and pervasive to alter [the plaintiff's] working environment.' " (*Ibid.*) But unlike in *Fuller,* where the harassment stopped due to "the harasser's voluntary and independent decision," in the case before the court, the coworker "stopped as a result of the employer's intervention." (*Id.* at p. 1196.)

The majority then turned to the issue of discipline. It first observed an "employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment. [(See *Harris v. L & L Wings, Inc.* (4th Cir.1997) 132 F.3d 978, 984 ['[A] good faith investigation of alleged harassment may satisfy the "prompt and adequate" response standard, even if the investigation turns up no evidence of harassment . . . [and] a jury later concludes that in fact harassment occurred.'].)]" (*Swenson, supra,* 271 F.3d at p. 1196.)

In the case before it, the results of the investigation led the Postal Service to conclude it could not establish a case of sexual harassment against the coworker. (*Swenson, supra,* 271 F.3d at p. 1196.) That was not the same as saying no harassment occurred, and in deciding whether to "punish" the coworker, the Postal Service "could properly take into account that [the coworker] was covered by a collective bargaining agreement, and so had the

20

right to grieve any discipline imposed on him. Having concluded that it had insufficient evidence to sustain a charge of harassment, the Postal Service had an entirely legitimate reason for declining to discipline [the coworker] and resorting to other methods of remedying the situation." (*Ibid.*)

"As a matter of policy," said the majority, "it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment." (*Swenson, supra*, 271 F.3d at p. 1196.) "In considering whether the employer's response was appropriate, we consider the overall picture. Even assuming that the investigation was less than perfect, the Postal Service nevertheless took prompt action to remedy the situation. The harassment stopped. The only possible consequence of a better investigation could have been to make out a stronger case for disciplining [the coworker]. But the purpose of Title VII is remedial—avoiding and preventing discrimination—rather than punitive. [Citation.] Failure to punish the accused harasser only matters if it casts doubt on the employer's commitment to maintaining a harassment-free workplace. Where an employee is not punished even though there is strong evidence that he is guilty of harassment, such failure can embolden him to continue the misconduct and encourage others to misbehave. But where the proof of harassment is weak and disputed, as it was in this case, the employer need not take formal disciplinary action simply to prove that it is serious about stopping sexual harassment in the workplace." (*Id.* at p. 1197.)

The majority noted there "seem[ed] to be some tension among [the circuit court] cases as to whether an employer must discipline the harasser if it determines that harassment has in fact taken place," comparing comments in *Intlekofer v. Turnage* (9th Cir. 1992) 973 F.2d 773, 781–783 (conc. opn. of

21

Keep, J.) and at page 786 (dis. opn. of Wiggins, J.) (adequate remedial action can be taken without disciplining the harasser, at least as a first response) with *Yamaguchi, supra,* 109 F.3d at page 1483 ("employer's actions must both end the current harassment and discipline the offender"). (*Swenson, supra,* 271 F.3d at p. 1197, fn. 16.)

However, *Star* "harmonize[d] these cases by explaining that, even when it finds that harassment has taken place, the employer may satisfy its remedial obligation by actions far short of formal discipline: 'The discussion in the cited cases makes clear that counseling or admonishing the offender can constitute an adequate "disciplinary" response.' " (*Swenson, supra,* 271 F.3d at p. 1197, fn. 16, quoting *Star, supra,* 237 F.3d at p. 1039.)

The Ninth Circuit's most recent Title VII cases generally follow the *Ellison/Fuller* approach. (E.g., *Okonowsky v. Garland* (9th Cir. 2024) 109 F.4th 1166, 1185 (*Okonowsky*) [" '[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.' [Citation.] If 'the remedy attempted is ineffectual, liability will attach.' [Citation.] 'In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct.' "]; *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, 811–812.) They also follow the two-step inquiry explicated in *Swenson.* (E.g., *Okonowsky,* at pp. 1186–1187 [examining employer's "initial response" and "permanent remedial steps," italics & some capitalization omitted].)

Recent Ninth Circuit cases also follow the calibrated approach to discipline discussed in *Swenson.* In *Campbell v. State Dep't of Educ.* (9th Cir. 2018) 892 F.3d 1005 (*Campbell*), for example, the court stated, "our law does not require an employer to be immediately and perfectly effective in

preventing all future harassment by a third party. Again, the question is one of negligence: Did the employer take steps that were *reasonably calculated* to end the harassment of which it was aware? [(*Freitag v. Ayers* (9th Cir. 2006) 468 F.3d 528, 538–540; *Swenson, supra,* 271 F.3d at pp. 1191–1192, 1196.)] Although the issue of whether the employer's actions successfully ended the harassment will be relevant to the question of whether those actions were reasonable, [(see *Freitag,* at p. 540)], our inquiry cannot be purely retrospective. That a corrective action did not actually end the harassment does not necessarily mean that, at the time the employer chose such course of action, it was *unreasonable to expect* that it would. We can evaluate the reasonableness of an employer's corrective measures only from the perspective of what the employer knew or should have known at the time it acted." (*Campbell,* at p. 1018.)

Thus, "an employer must be permitted to respond incrementally to allegations of harassment by a third party. As an initial matter, the employer must learn what actually happened," and the " 'most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.' " (*Campbell, supra,* 892 F.3d at p. 1018, quoting *Swenson, supra,* 271 F.3d at p. 1193.) "Such an investigation, itself, 'is a warning, not by words but by action' that puts all parties 'on notice that [the employer] takes such allegations seriously and will not tolerate harassment in the workplace.' " (*Campbell,* at p. 1018.) "Even where a complaint is found to be true, sometimes counseling or formally warning the perpetrator may be a sufficient response if the circumstances suggest that such action is reasonably expected to end the problem." (*Ibid.*) "Of course, if the harassment continues, then the employer may need to escalate to more

23

aggressive disciplinary measures as less severe measures prove inadequate. [Citations.] That is, the employer cannot unreasonably fail to follow through on its warnings or repeatedly resort to corrective measures that have proven ineffective." (*Id.* at pp. 1018–1019.)

With this overview of the Ninth Circuit's application of the analogous adequate-remedial-measures reasonably-calculated-to-end-the-harassment Title VII standard, we turn to the record in the instant case.

Compared to the detailed factual records in these Ninth Circuit cases, the record before us with respect to the City's corrective action is scant. As the Supreme Court observed, the parties "barely briefed" the issue below. (*Bailey*, *supra*, 16 Cal.5th at p. 636.)

Rather, the City devoted its memorandum of points and authorities in support of its motion to arguing "a co-worker's one-time use of a slur does not amount to severe or pervasive harassment." (Boldface omitted.) It discussed its corrective action in only a single paragraph. Notably, the City never addressed whether its response was reasonably anticipated to both end the coworker's alleged harassment and prevent any such harassment in the future by either the coworker or other employees.

Bailey, in turn, focused her opposing memorandum on the "single slur" issue, and only briefly argued that the City's efforts had "minimized" the coworker's conduct and "ignored the trauma" it caused her when she was required to "cover" for the coworker. She also maintained the City failed to take into account the "hostile comments and actions of Monachino-Taylor."

In reply, the City all but urged the trial court to ignore the corrective action issue. Indeed, it faulted Bailey for "conflating" that issue with the real gravamen of its motion: "Plaintiff's arguments regarding Defendant's response to her allegation are *irrelevant to the Court's analysis here*, which is

24

*solely* focused on whether . . . Larkin's one-time use of a racial slur can amount to severe or pervasive harassment." (Italics added.) Although the City dropped a footnote to ostensibly preserve its corrective-action argument, the tenor of its reply understandably led the trial court to state at the outset of the hearing, "It seems . . . based on the opposition and the reply that there really are only two issues. [¶] . . . [1] whether the use of the [N-word] by a co-worker . . . can without more create a . . . hostile work environment, and [2] whether [Bailey]. . . has shown a triable issue as to an adverse employment action." Both counsel endorsed that framing; neither mentioned corrective action at the hearing.

The City's treatment of the corrective action issue as an afterthought helps explain why the record does not enable it to now establish that its response was adequate as a matter of law. The record contains almost no evidence relevant to whether the response had the "ability to . . . deter future harassment." (*Bailey*, *supra,* 16 Cal.5th at p. 635, citing *Nichols*, *supra,* 256 F.3d at p. 875.) For example, while there are references in the record to the City's "Harassment-Free Workplace Policy," there is no copy of the policy.[7] Nor is there a copy of any progressive discipline policy that may have guided the City's response to the coworker's conduct. It also does not include evidence of proactive measures the district attorney's office or the City as a whole have taken to prevent harassment, or of measures taken in response to the incident here to reinforce any such efforts.

---

[7] Bailey submitted a copy of a page from a 2008 Employee Handbook with one paragraph headed "Policy Prohibiting Harassment." (Underscoring omitted.) Nothing suggests this single paragraph from a 2008 handbook is the "Harassment-Free Workplace Policy" in effect in 2015 which the parties discussed in their briefing.

We therefore conclude, as has the Ninth Circuit in many analogous Title VII cases, that triable issues remain as to whether the City took immediate and appropriate corrective action.[8] As these cases demonstrate, whether the City took such action is a highly nuanced, fact-specific inquiry, and we express no opinion as to how this issue will ultimately be resolved by the trier of fact.

### *Revival of Discrimination and Failure-to-Prevent Claims*

The second issue we have been directed to consider on remand is whether, in light of the Supreme Court's rulings, Bailey's claims against the City for "discrimination" and failure to prevent "discrimination" have been revived.

In answering this question, we take into account that the term "discrimination" has in some contexts been used broadly to include both discrimination and harassment. (See *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 280 ["For FEHA claims, the discrimination requirement has been phrased similarly [to that under Title VII]: 'To plead a cause of action for [hostile work environment] sexual harassment, it is "only necessary to show that gender is a substantial factor

---

[8] These issues include (but are not limited to) whether the City properly exercised its discretion with regard to separating Bailey and Larkin (see *Swenson, supra,* 271 F.3d at pp. 1194–1195), whether the City's actions with respect to Larkin were reasonably anticipated to stop the alleged harassment and prevent further harassment (see *Campbell, supra,* 892 F.3d at pp. 1018–1019), and whether Taylor-Monachino's conduct toward Bailey would tend to deter her and other employees from reporting future harassment, suggesting the City was not committed to a harassment-free workplace (cf. *Swenson,* at p. 1193 ["investigation that is rigged to reach a pre-determined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation"]; *Fuller, supra,* 47 F.3d at pp. 1528–1529).

in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner,' " ' "]; *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 203 ["The sine qua non of any sexual harassment claim is that the plaintiff suffered discrimination because of sex."][9].)

However, as the high court explained in *Roby, supra,* 47 Cal.4th 686, "the terms 'discriminate' and 'harass' appear in separate provisions [of FEHA] and define distinct wrongs." (*Id.* at p. 705.) "FEHA's discrimination provision addresses only explicit changes in the 'terms, conditions, or privileges of employment' . . . ; that is, changes involving some *official action taken by the employer*." (*Id.* at p. 706, quoting § 12940, subd. (a), first italics omitted.) "By contrast, harassment often does not involve any official exercise of delegated power on behalf of the employer." (*Roby*, at p. 706; see § 12940, subd. (j)(1).)

We therefore first consider whether Bailey asserts viable discrimination and failure to prevent discrimination claims against the City, and second consider whether she asserts viable failure to prevent harassment and retaliation claims against the City.

### *Discrimination and Failure to Prevent Discrimination*

In our original opinion, we affirmed summary judgment for the City on Bailey's harassment claim on the grounds the racial epithet by Bailey's coworker did not rise to the level of a hostile work environment and, in any case, there was no triable issue that the City took appropriate corrective action. (*Bailey v. San Francisco District Attorney's Office* (Sept. 16, 2020, A153520 [nonpub. opn.].) We affirmed the summary judgment for the City on Bailey's retaliation claim on the ground there was no triable issue she had

---

[9] Legislatively overruled on another ground by Stats. 2013, ch. 88, § 1, amending section 12940, subdivision (j)(4)(C).

suffered an adverse employment action.  (*Bailey v. San Francisco District Attorney's Office, supra*, A153520.)  Having sustained summary judgment as to these claims, we concluded her failure to prevent " 'discrimination, harassment or retaliation' " claims also necessarily failed.  In the course of considering Bailey's claims, we noted "Bailey conceded 'the only race-related allegation' at issue was Larkin's racial slur.  As the trial court recited, it was undisputed Bailey did 'not believe that Taylor[-Monachino's] conduct towards her had anything to do with their African-American backgrounds.' "  (*Bailey v. San Francisco District Attorney's Office, supra*, A153520.)

As to Bailey's harassment claim, the Supreme Court ruled there is a triable issue as to whether her coworker's racial slur created a hostile work environment.  And in reconsidering the City's response to that conduct as directed by the high court, we have concluded there is also a triable issue as to whether the City took immediate and appropriate corrective action.  As to Bailey's retaliation claim, the Supreme Court ruled there is a triable issue as to whether Taylor-Monachino's conduct rose "to the level of an adverse employment action."  (*Bailey, supra*, 16 Cal.5th at pp. 638–639.)  The high court also noted, similarly to our own observation, that the trial court had refused to consider Bailey's argument that Taylor-Monachino's conduct constituted actionable discrimination because it contradicted Bailey's own deposition testimony that Taylor-Monachino's conduct was not based on her race, and Bailey had not taken issue with that ruling on appeal.  (*Id.* at p. 627, fn. 4.)  The court therefore "adopt[ed] the parties' framing of Bailey's harassment claim" and did "not consider whether Taylor-Monachino's acts . . . were 'because of race.' "  (*Ibid.*)

To prevail on a FEHA *discrimination* claim, the plaintiff must establish that the allegedly adverse employment action was taken "*because of . . . race.*"

28

(§ 12940, subd. (a), italics added). Thus, even if there is a triable issue as to whether Taylor-Monachino's actions rose to the level of an adverse employment action, in light of Bailey's deposition testimony and her failure to challenge the trial court's rejection of any discrimination claim based on Taylor-Monachino's actions, Bailey cannot prove the essential discriminatory element of a FEHA discrimination claim.

Accordingly, there has been no revival of any FEHA *discrimination* claim against the City. And consequently, there has been no revival of any correlative claim that the City failed to prevent such discrimination. (See *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1314–1316; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 288–289.)

*Failure to Prevent Harassment and Retaliation*

Bailey titled her fourth cause of action "Violation of [FEHA] [¶] (Failure to Prevent Discrimination) [¶] [California Government Code § 12940(k)]." Subdivision (k) provides that it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) We therefore liberally read Bailey's fourth cause of action as embracing not only a claim of failure to prevent discrimination but also claims of failure to prevent harassment and retaliation. (See *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1239–1240 [holding retaliation is also "a form of discrimination actionable under section 12940, subdivision (k)"], disapproved on another ground by *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1162, 1174.)[10]

---

[10] We decline the City's invitation to reject *Taylor's* reasoning as to the scope of section 12940, subdivision (k). Its holding in that regard has never been criticized or legislatively overruled, and it has been cited favorably by

Given that the Supreme Court and this court have now ruled there are triable issues as to harassment and retaliation, we conclude Bailey can also now proceed on her failure to prevent harassment and retaliation claims under section 12940, subdivision (k).

## DISPOSITION

The summary judgment is reversed, and the matter remanded for further proceedings consistent with this opinion and the opinion of the Supreme Court.  Appellant shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

federal courts ruling on FEHA claims and in CACI No. 2527 [Failure to Prevent Harassment, Discrimination, or Retaliation].  (E.g., *Lopez-Rodriguez v. Kern Medical Surgery Center, LLC* (E.D.Cal., Dec. 3, 2022, No. 120CV01187ADACDB) 2022 WL 17904540, at p. *11; *Rockymore v. Eurofins Donor & Product Testing, Inc.* (N.D.Cal., July 11, 2022, No. 3:22-CV-00176-WHO) 2022 WL 2704122, at p. *6 & fn. 3 [rejecting argument for disagreeing with *Taylor*]; see *Department of Fair Employment & Housing v. M&N Financing Corp.* (2021) 69 Cal.App.5th 434, 445 [distinguishing *Taylor* with apparent approval].)

_____
Banke, J.


We concur:


_____
Humes, P. J.


_____
Hill, J.*


*Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A153520, *Bailey v. San Francisco District Attorney's Office et al.*


31